## LAURA Y. CLINE v. CALVIN C. CLINE

### No. 74

(Filed 12 June 1979)

**1. Trusts § 19— wife's action to establish resulting or constructive trust—sufficiency of evidence**

Evidence was sufficient to establish either a constructive or a resulting trust in plaintiff's favor in the land described in the complaint where it tended to show that defendant breached the confidential relationship of husband and wife when he took from his mother title to a farm in his name alone after representing to his wife that the land would be theirs jointly after the mortgage thereon was paid; plaintiff moved onto the farm with defendant and their children and there cared for defendant's mother; and plaintiff by her contributions and labor paid at least one-half of the mortgage.

**2. Trusts § 13.1— resulting trust—promise made before deed delivered—subsequent payment**

A resulting trust arises where the person claiming it proves a payment on the purchase price made to the grantee or grantor after the delivery of the deed but pursuant to a *promise made to the grantee* before the deed was delivered, since there is no difference in principle between paying money toward a purchase price at the time of the delivery of a deed and contracting at that time to pay the same sum later and then paying it as promised.

**3. Trusts § 20— constructive trust—jury instructions adequate**

Though the trial court's instruction with respect to the establishment of a constructive trust was not a model of clarity and organization, it did sufficiently inform the jury that for plaintiff to prevail on her claim of a constructive trust she must satisfy the jury by clear, strong and convincing evidence that: (1) there was an agreement, either express or implied, between the parties that title to the land in question was to have been placed in their names jointly and that they were to pay off the mortgage thereon jointly; (2) thereafter, defendant breached the confidential or fiduciary relation the law presumes to exist between a husband and wife by having the deed made to himself alone without plaintiff's knowledge; and, (3) in ignorance of defendant's breach of trust, plaintiff contributed at least one-half of the funds used to pay off the mortgage which encumbered the land at the time of the purchase.

**4. Trusts § 15— equitable owner in possession of land—action to establish trust—statute of limitations**

Where the evidence disclosed that defendant's mother deeded the land in question to him on 15 January 1951, that plaintiff wife remained in possession of the land continuously, and that plaintiff did not learn that defendant had taken title in his name alone until the latter part of July 1975 when the parties separated, there was no merit to defendant's contention that plaintiff's action was barred by the statute of limitations, since, so long as an equitable owner retains possession, nothing else appearing, the statute of limitations does not

run against him but begins to run only from the time the trustee disavows the trust and knowledge of his disavowal is brought home to the *cestui que trust*.

Justices BRITT and BROCK took no part in the consideration or decision of this case.

ON plaintiff's petition under G.S. 7A-31(a) for discretionary review of the decision of the Court of Appeals vacating the judgment entered on 9 August 1976 by *Osborne, J.*, in the District Court of YADKIN. The opinion by *Vaughn, J., Hedrick* and *Clark, JJ.*, concurring, is reported in 34 N.C. App. 495 (1977). The appeal was docketed and argued as Case No. 47 at the Spring Term 1978.

On 12 September 1975 the plaintiff, Laura Y. Cline, instituted this action against her husband, Calvin C. Cline, the defendant, for the purpose of obtaining (1) a divorce from bed and board, alimony, and alimony *pendente lite*, and (2) an equitable lien in the amount of $25,000 on a specifically described 48-acre tract of land in Booneville Township, Yadkin County, North Carolina. In his answer defendant denied the material allegations in the complaint and asserted a counterclaim for divorce from bed and board, alimony, and alimony *pendente lite*. In addition, he prayed for the possession of the land described in the complaint.

On 9 August 1976 the Court permitted plaintiff to amend her complaint to allege a third claim, *i.e.*, that she is entitled to have established in her favor a resulting trust or, in the alternative, a constructive trust in one-half of the 48 acres previously described. In his reply, defendant denied every allegation in plaintiff's third claim and specifically pled the three and ten-year statutes of limitations in bar of her right to subject the land to an equitable lien or trust in her favor.

When the case came on for trial on 10 August 1976, the trial judge severed the parties' respective claims for divorce and alimony from plaintiff's claim of an equitable lien, a resulting trust or a constructive trust in the 48 acres and elected to try the latter. Plaintiff's evidence tended to show the facts detailed below.

Plaintiff and defendant were married in 1944. Defendant's parents, Charlie and Eva Cline, bought the land in suit (which then contained about 70 acres) in February 1950. They financed the purchase with a $3,500 loan, secured by a deed of trust to the

Veterans Administration. Mr. Charlie Cline made one payment on the note and died in December 1950. Thereafter, at a family meeting held to determine what arrangements could be made to save the land and to care for their mother, it was determined that none of defendant's brothers and sisters were willing to move on the land or to pay for it.

Plaintiff testified that after the family caucus defendant said to her, "We'll have to live up there and farm the land and finish paying for the place, then it will be ours." Plaintiff agreed to these conditions. Early in January 1951 she and defendant moved on the farm with Mrs. Eva Cline, who lived there until her death during the spring of 1976. Plaintiff said, "She lived with us. We kept her up. I done the buying of the groceries. I kept her up and the kids too."

In 1951 the farm contained approximately 60 acres and the unpaid balance due on the deed of trust was $3,000, payable in annual installments of about $300. Plaintiff and defendant raised tobacco every year and made the annual payments to the Veterans Administration from the proceeds of the tobacco sales. Prior to May 1964, when defendant received serious injuries in an automobile accident, plaintiff and defendant "worked equally." A "number of times" over the years defendant said to plaintiff, "When the property is paid for it will be 'ours'."

Plaintiff testified, "I hung tobacco, I strung tobacco, I sacked tobacco, I oiled tobacco, I hoed tobacco . . . I took it off the sticks." During the two or three years they leased their tobacco allotment she continued to work in tobacco by "hiring out to people in the summer to make enough money to get on our feet." Neighbors and others corroborated plaintiff's testimony as to her labors on and off the farm. She was described as "always having been a hard-working woman both at home and away from home." Since 1950, except for about five months preceding the birth of her third and last child in April 1952, the six or seven months following defendant's automobile accident in 1964, and the time she necessarily spent working in tobacco, plaintiff worked away from the farm at "public work" for wages of from $80 to $120 a week.

On 16 May 1959 plaintiff and defendant paid off the deed of trust to the Veterans Administration. However, in April 1959

plaintiff, defendant, and Mrs. Eva Cline had executed a note and deed of trust on the property to secure a loan of $3,500 from the Federal Land Bank. This money was paid back "out of tobacco" at the rate of $175 annually and was paid off on 22 December 1974. Plaintiff testified that the Veterans Administration loan was never really paid off until the 22nd of December 1974. In addition to this loan, between 4 August 1959 and 7 December 1965, plaintiff, defendant, and Mrs. Cline executed notes and deeds of trust to the Production Credit Corporation to secure loans in the amount of $300, $2,470, and $3,000. The proceeds from these loans were used to buy a tractor, to erect a tobacco barn and packing house, and to complete the dwelling in which plaintiff and defendant were living at the time of the separation. This dwelling was begun in 1953 or 1954 and completed in 1959. The money to repay the loans from the Federal Land Bank and the Production Credit Association came mostly out of tobacco and from plaintiff's earnings. To pay for the roof and storm doors on the new house plaintiff sold 10 shares of R. J. Reynolds stock which she had acquired during the five years she worked for that company. The original cost of the house was approximately $11,000 and plaintiff testified that she was "responsible" for half of that amount. At the time of the trial plaintiff's evidence tended to show that the fair market value of the land (then 48 acres), with its improvements, was $70,000 to $82,600.

On several occasions prior to 1975 plaintiff, along with her husband and his mother, had signed deeds to purchasers of a small portion (or lot) of the land.

On or about 1 June 1975, defendant separated himself from plaintiff and left the marital home. Thereafter, in the latter part of July, plaintiff first learned that on 15 January 1951 Mrs. Eva Cline had conveyed the land in suit, subject to her life estate, to defendant and that plaintiff was not named as a grantee in the deed. This deed had been recorded on 27 January 1951.

Defendant's testimony tended to show the facts to be as follows:

In 1951, after his father's death, he told plaintiff he "had to go up there and look after [his] mother because she couldn't take care of the place," which his father had farmed. He also told her he had to "take over" because he, along with his parents, had

signed the deed of trust which encumbered the farm. (On cross-examination, defendant conceded that plaintiff's Exhibit No. 1, a certified copy of the purchase-money deed of trust which his parents had executed to the Veterans Administration, did not show his signature. Notwithstanding, he said he was sure that he had signed *a* deed of trust.) When he asked plaintiff to move "up there" with him she agreed to go, and they and their three sons moved to the farm. Before they moved she told him twice that "she didn't want no part of it [the land] and wouldn't help pay for it"; and after they moved "she kept saying she wasn't going to help pay for it."

Defendant testified that he never, at any time, told plaintiff that the farm would some day be theirs or that any part of it would be hers. On the contrary, he had told her specifically that at his mother's death the property would belong to *him*. Plaintiff had full knowledge of the deed in suit from the time it was executed; that on 15 January 1951 he told his wife he and his mother were "going over to town to translate our deed." Plaintiff did not accompany them, but upon their return, they "set down with her and explained to her how the deed was. . . . She said she did not care about the deed. She did not want no part of it. She wasn't going to help pay for it." The consideration recited in the deed was one dollar and the grantee's assumption of "the debt to the Veterans Administration." After the deed was recorded it was kept in defendant's top bureau drawer, "free for everybody to see it." The drawer was never locked. Over the years, he thought the deed "had been discussed three or maybe four times."

Defendant asserted that although plaintiff had "worked at public work ever since 1951 and up until this day," her money all went for "automobiles, clothes, and getting her hair fixed up" at the beauty parlor; that she "never brought in any money that she earned at her employment for the purpose of making any payments on the house or the land either one." Proceeds from the sale of timber on the land ($2,800) and the money he recovered in 1957 in a personal injury action ($4,800) went into the house. Further, defendant said he could not recall plaintiff contributing any amount to the family budget since 1961; that she "never paid a cent" on any deed of trust on the land; that "she hardly did any

Cline v. Cline

work on the farm"; and that he couldn't get her "to pull a bloom" out of the plant bed.

According to defendant's testimony, in 1964 he had another serious automobile accident which left him 90% totally and permanently disabled. Since then he has been receiving social security benefits. In consequence of this accident the crops have been "hired done," and plaintiff has "spent mighty little time doing farm labor." Out of the proceeds of the tobacco and other crops defendant paid the labor and all other farm expenses, gave his mother a portion of the profits from the farm, and defrayed all the family living expenses. From time to time he, his wife, and mother borrowed money, all of which was paid back with the proceeds of the sale of tobacco. All the money from the tobacco was put back into the farm.

As a witness for defendant, his sister, Ruby Block, testified that in 1957 or 1958 she heard plaintiff tell defendant that the reason she would not help him with the farm was because her mother-in-law had "signed it over to him and her name was not on the deed and she didn't have any part in it."

Dean Cline, the parties' 26-year-old son, testified that when he was 12 or 13 years old he learned that the deed to the farm was in his father's name but his grandmother had a life estate in the land. His mother, he said, worked most of the time at "public work," but she did help some with the farm. She had bought groceries, had bought him clothes, and had bought his children clothes. However, as far as he knew, it was always his father who went to the Production Credit and to the Federal Land Bank to make payments on the mortgage against the property. Representatives of these institutions and of the Iredell Insurance Agency, which carried the insurance on the crop and farm building, testified that it was always defendant who came in and paid the installments due on the loans and the insurance premiums. They did not know, however, "where the money came from."

Robert Cline, the parties' 31-year-old son, testified that over the years his mother worked at both "public work" and on the farm; that he never knew of her refusing to work in the tobacco; that his "mother was a hard working woman; when she worked she worked." She "pitched in and helped with everything." She bought groceries and his father bought groceries. Robert Cline

recalled hearing his father say he had a deed to the place, but he "did not know until recently, a few years back, that his mother's name was not on the deed." He had heard his parents arguing about the deed, but he had never seen it.

The jury's verdict was that plaintiff was entitled to have both a resulting and a constructive trust imposed upon the land in her favor and that her claim for relief was not barred by the ten-year statute of limitations.

Upon defendant's appeal, the Court of Appeals held the evidence sufficient to support the verdict as to a resulting trust but ordered a new trial because, it said, "The jury was never instructed that it must find that plaintiff advanced the consideration [her promises] before legal title was placed in defendant." In its opinion the Court of Appeals suggested that upon retrial of the case the judge would be "well advised not to attempt to instruct on the theory of a constructive trust." We allowed plaintiff's petition for discretionary review.

*Finger, Park & Parker by Raymond A. Parker II and M. Neil Finger for plaintiff.*

*Franklin Smith and Henry B. Shore for defendant.*

SHARP, Chief Justice.

[1] We consider first defendant-appellee's contention, brought to this Court in his brief under App. R. 16(a), that plaintiff's evidence was insufficient to establish either a resulting or a constructive trust, and that the trial court erred therefore in denying his motion for a directed verdict at the close of all the evidence. *See Investment Properties v. Allen,* 281 N.C. 174, 188 S.E. 2d 441 (1972).

The evidence in this case would permit the jury to find the following facts:

(1) After the death of defendant's father, defendant's mother was unable to farm their land and to make the annual payments on the mortgage. She told defendant, whose family consisted of his wife, the plaintiff, and their three young sons, that if he would move on the land with her and make the mortgage payments she would convey the property to him, subject to her life estate.

Cline v. Cline

(2)   Defendant discussed the situation with his wife and told her that if they would move on his mother's place with her, farm the land, and pay the mortgage, the property would then be theirs. He asked her to move "up there" with him. She agreed to the proposition defendant had stated to her, and the move was made.

(3) In less than 15 days after the move was accomplished and before the first payment was made on the mortgage, defendant caused his mother to convey the land, subject to her life estate, to him alone. The consideration for this conveyance was defendant's promise to move on the land and to pay the mortgage which encumbered it. Plaintiff had no knowledge of this conveyance at the time it was made and first learned of it in the latter part of July 1975.

(4) In performance of the agreement plaintiff made with defendant preceding their move to his mother's farm, and in reliance upon defendant's representations to her that when they had satisfied the mortgage on the land it would belong to them jointly, plaintiff by her labor assisted defendant in caring for his mother and in cultivating and harvesting tobacco, their annual cash crop. By her labor on the farm and her contributions in money, which she earned in "public work" off the farm, plaintiff paid one-half of the original mortgage indebtedness on the farm and also of subsequent encumbrances securing loans for the purchase of farm machinery and making improvements on the land. In addition, from her wages plaintiff made cash contributions to the support of the family.

Once proven, the foregoing facts are sufficient to establish either a constructive or a resulting trust in plaintiff's favor in the land described in the complaint. *See Bowen v. Darden*, 241 N.C. 11, 84 S.E. 2d 289 (1954); *Davis v. Davis*, 228 N.C. 48, 44 S.E. 2d 478 (1947).

Whenever one obtains legal title to property in violation of a duty he owes to another who is equitably entitled to the land or an interest in it, a constructive trust immediately comes into being. Such a trust ordinarily arises from actual or presumptive fraud and usually involves an abuse of a confidential relationship. Courts of equity will impose a constructive trust to prevent the unjust enrichment of the holder of the legal title to property ac-

quired through a breach of duty, fraud, or other circumstances which make it inequitable for him to retain it against the claim of the beneficiary of the constructive trust. *See Fulp v. Fulp*, 264 N.C. 20, 140 S.E. 2d 708 (1965); *Davis v. Davis, supra*; 13 Strong's North Carolina Index 3d *Trusts* § 14 (1978); V Scott, Law of Trusts § 461-462.4 (3d Ed. 1967).

The parties to this action are husband and wife. The law recognizes that "[t]he relationship between husband and wife is the most confidential of all relationships, and transactions between them to be valid, must be fair and reasonable." *Eubanks v. Eubanks*, 273 N.C. 189, 195-96, 159 S.E. 2d 562, 567 (1968); *Fulp v. Fulp, supra*. Taking plaintiff's evidence as true — as we must when considering a motion for a directed verdict, *Rappaport v. Days Inn*, 296 N.C. 382, 250 S.E. 2d 245 (1979) — defendant clearly breached this confidential relationship when he took title to the farm in his name alone after representing to his wife that the land would be theirs jointly after the mortgage was paid. A constructive trust arose, therefore, in her favor at the time defendant wrongfully took title solely in his name. Thereafter, in accordance with plaintiff's understanding with defendant that they were both obligated to pay off the mortgage which encumbered the property at the time defendant agreed to move on his mother's farm, plaintiff's contributions in labor and money paid at least one-half of the mortgage. Thus the equities remained with her and she is entitled to enforce the constructive trust which arose in her favor. Otherwise, defendant would be unjustly enriched at her expense.

The classic example of a resulting trust is the purchase-money resulting trust. In such a situation, when one person furnishes the consideration to pay for land, title to which is taken in the name of another, a resulting trust commensurate with his interest arises in favor of the one furnishing the consideration. The general rule is that the trust is created, if at all, in the same transaction in which the legal title passes, and by virtue of the consideration advanced before or at the time the legal title passes. *See Fulp v. Fulp*, 264 N.C. 20, 140 S.E. 2d 708 (1965); *Rhodes v. Baxter*, 242 N.C. 206, 87 S.E. 2d 265 (1955); *Deans v. Deans*, 241 N.C. 1, 84 S.E. 2d 321 (1954); V Scott, Law of Trusts §§ 440-440.1 (3d Ed. 1967); Bogert, Trusts and Trustees § 455 (2d

Ed. 1977) (hereinafter cited as Bogert). *See generally* 13 Strong N.C. Index 3d *Trusts* §§ 13-13.5 (1978).

If A and C pay for a parcel of land, but only C takes title, the theory of the law is that at the time title passed A and C intended that both would have an interest in the land. "A resulting trust is a creature of equity, and arises by implication or operation of law to carry out the presumed intention of the parties, that he, who furnishes the consideration for the purchase of land, intends the purchase for his own benefit." *Waddell v. Carson*, 245 N.C. 669, 674, 97 S.E. 2d 222, 226 (1957). This rule does not apply where A and C agree to buy a tract of land but A *pays* the purchase price and takes title in his name. In this situation, while it is possible — depending upon the circumstances — that he may have other remedies, no resulting trust arises in C's favor when consideration passes from him to A thereafter. *Bryant v. Kelly*, 279 N.C. 123, 181 S.E. 2d 438 (1971); *Rhodes v. Baxter*, 242 N.C. 206, 87 S.E. 2d 265 (1955).

[2] However, as Bogert points out, § 456 at 669-673, in a large number of cases the person claiming a resulting trust proves a payment on the purchase price made to the grantee or grantor after the delivery of the deed but pursuant to a *promise made to the grantee* before the deed was delivered. Although it seems that this Court has not considered the application of the resulting trust doctrine to this specific situation other jurisdictions have. *See* Bogert, § 456, n. 25, where the authorities are collected. In discussing the "large group of cases [in which] the person claiming a resulting trust proves payment after the delivery of the deed, pursuant to a promise made *to the grantee* . . . before delivery of the deed," Bogert offered the following example and comments:

"A is bargaining for land to be bought from B, and A seeks the aid of C in financing the sale. It is agreed between A and C that A shall pay part of the price at the time of the delivery of the deed from B to A, and that A shall give a note and mortgage to B for the remainder of the purchase price; and C agrees with A that C will make payments to A in the future which A agrees to use to help him in meeting his obligations to B. Here C, the third party, does not promise the grantor, B, anything. The consideration received by the grantor for his deed consists of cash paid by the grantee, A, and a note and mortgage executed by the grantee,

A, alone. C's promise to the grantee, A, is not to pay the purchase price, because technically one can pay the purchase price only to the seller of the land. C's agreement with A is to make a payment to A which will enable A to pay the purchase price." Bogert § 456 at 673.

"If the promise of C has been performed by the making of the agreed payment to A, the grantee, after delivery of the deed to A, the authorities hold that C obtains a resulting trust arising at the date of C's payment, but relates back in effect to the time of the taking of title by the grantee, A." Bogert justifies this result in either of two ways: "(1) by a finding that C's promise to A and his performance of it are equivalent in practical effect to a payment of part of the price of the land at the time of the delivery of the deed; or (2) by an argument that even if C's conduct is something totally distinct from paying part of the purchase price to the grantor, there is ground for an inference or presumption of an agreement between the prospective grantee and C that C should have an equitable interest in the land corresponding to the amount of his payment to the grantee." *Id.* at 674. Certainly the logic of such an inference is as cogent in this situation as it is in that of the classic purchase-money resulting trust. There is no difference in principle between paying money toward the purchase price at the time of the delivery of a deed and contracting at that time to pay the same sum later and then paying it as promised. *See Id.* at 672, 673.

It was the foregoing theory of a resulting trust which the trial judge attempted to explain to the jury in his charge upon the first issue. We agree with the Court of Appeals, which approved the theory, that the charge was an insufficient and somewhat confusing explanation of the applicable law, and that from it the jury might well have concluded plaintiff's right to have a resulting trust established in her favor depended solely on the contributions which she made subsequent to the delivery of the deed to defendant without determining whether a promise was made to defendant before he obtained title. For this reason the jury's answer to the first issue must be vacated. Notwithstanding, we affirm the judgment of the trial court upon the jury's answer to the second issue, which established plaintiff's right "to have a constructive trust imposed upon the land de-

scribed in the complaint so as to create a joint ownership in said property by the plaintiff and defendant."

[3] Concededly the charge on the second issue is not a model of clarity and organization. However, when it is read as a whole we think the judge made it clear that for plaintiff to prevail on the second issue she must satisfy the jury by clear, strong, and convincing evidence that there was an agreement, either express or implied, between the parties; that the title to the land was to have been placed in their names jointly and that they were to pay off the mortgage jointly; that thereafter defendant breached the confidential or fiduciary relation the law presumes to exist between a husband and wife by having the deed made to himself alone without her knowledge; that, in ignorance of his breach of trust, she contributed at least one-half of the funds used to pay off the mortgage which encumbered the land at the time of the purchase. The judge specifically informed the jury that any funds plaintiff might have invested in improvements on the property did not bear upon the issue of constructive trust, which arose only in connection with the actual purchase of the land itself.

In this Court defendant's contentions with reference to the charge on the second issue are that "the trial judge engaged in the academics of constructive trusts and the contentions of the parties" and that "there is insufficient evidence to support the judge's charge on this issue." He reargues the sufficiency of the evidence to withstand his motion for a directed verdict and questions the credibility and weight of plaintiff's evidence.

In the final analysis, despite the somewhat complicated questions of trust law involved, this case resolved itself into simple issues of fact: (1) Did plaintiff and defendant agree, before they moved to the farm and before he procured title in himself (as plaintiff testified), that *they* would pay off the mortgage and title would then be taken in their names jointly; or, did defendant tell plaintiff (as he testified) that when his mother died the property would belong to *him*? (2) If the agreement was made as plaintiff testified, did she — pursuant to their agreement and in ignorance of the fact that he had taken title in himself — contribute to defendant for the purpose of paying off the mortgage at least half the amount due; or did she "never bring in any money" for that purpose, as defendant testified? The jury, who heard the evidence

and observed the demeanor of the witnesses, resolved all issues in favor of plaintiff. On the second issue submitted to the jury we find no prejudicial error in the court's instructions on constructive trusts.

[4]   Finally, we find no merit in defendant's contention that plaintiff's action is barred by the statute of limitations. "A resulting or constructive trust, as distinguished from an express trust, is governed by the ten-year statute of limitations. G.S. 1-56. . . . Moreover it is established by authoritative decisions of this Court that the statute of limitations does not run against a *cestui que trust* in possession." *Bowen v. Darden*, 241 N.C. 11, 17, 84 S.E. 2d 289, 294 (1954). So long as an equitable owner retains possession, nothing else appearing, the statute of limitations does not run against him. The statute begins to run only from the time the trustee disavows the trust and knowledge of his disavowal is brought home to the *cestui que trust*, who will then be barred at the end of the statutory period. *Solon Lodge v. Ionic Lodge*, 247 N.C. 310, 317-18, 101 S.E. 2d 8, 13-14 (1957).

The record discloses that defendant's mother deeded the land in suit to him on 15 January 1951, and that plaintiff has remained in possession continuously. Further, plaintiff testified that she did not learn defendant had taken title in his name alone until the latter part of July 1975 when the parties separated. Defendant, of course, contends that she knew this from the date of the deed. Thus, the issue of the bar of the ten-year statute of limitations was properly submitted to the jury, which answered it in favor of plaintiff.

For the reasons stated, the decision of the Court of Appeals awarding defendant a new trial is reversed. The cause will be returned to that court with instructions that it be remanded to the District Court of Yadkin County with directions that the judgment in this case, filed 23 May 1976, be reinstated.

Reversed.

Justices BRITT and BROCK took no part in the consideration or decision of this case.