MARVIN L. SPECK AND STANLEY E. GILLILAND v. NORTH CAROLINA DAIRY FOUNDATION, INC., THE BOARD OF GOVERNORS OF THE UNIVERSITY OF NORTH CAROLINA, THE BOARD OF TRUSTEES OF NORTH CAROLINA STATE UNIVERSITY, A CONSTITUENT INSTITUTION AND THE ACTING CHANCELLOR OF NORTH CAROLINA STATE UNIVERSITY

No. 8210SC920

(Filed 18 October 1983)

**Fiduciaries § 2; Limitation of Actions § 7— breach of fiduciary duty—constructive trust—sufficiency of evidence—statute of limitations**

In an action to recover a share of the royalties defendants received from the marketing of Sweet Acidophilus milk, the secret process for which had been developed by plaintiffs, plaintiffs' evidence raised a genuine issue of material fact as to whether defendants N.C. State University and N.C. Dairy Foundation had a fiduciary duty to plaintiffs which they breached so as to give rise to a constructive trust where it tended to show that plaintiffs were employees of defendant University; pursuant to University policy, plaintiffs entrusted their secret process for Sweet Acidophilus to the University, and the University exercised authority and control over the commercial development of the process; the University traditionally awarded 15% of the royalties it received from a product to its faculty inventor; the University, plaintiffs and the Dairy Foundation worked together to obtain a trademark for Sweet Acidophilus milk through the Dairy Foundation; the Sweet Acidophilus was marketed through the Dairy Foundation, which was an agent of the University for that purpose; and the University has denied plaintiffs' request for a share of the royalties. Therefore, the ten-year statute of limitations of G.S. 1-56 may apply to plaintiffs' case.

Judge HEDRICK dissenting.

APPEAL by plaintiffs from *Farmer, Judge.* Judgment entered 2 July 1982 in Superior Court, WAKE County. Heard in the Court of Appeals 9 June 1983.

The plaintiffs brought suit to recover a share of the royalties defendants had received in connection with plaintiffs' research on acidophilus milk. Plaintiffs based their claim on the following events:

Plaintiff Speck spent several years during his tenure as a professor at North Carolina State University (hereinafter, "the University") studying how to make a good-tasting milk product containing lactobacillus acidophilus bacteria. Plaintiff Gilliland assisted him. They developed a technique for producing concen-

trated acidophilus which maintained its resistance to bile without adding sour flavor to milk. The plaintiffs' research is significant because acidophilus apparently inhibits the growth of unhealthy micro-organisms in human intestines while facilitating good digestion. Prior to plaintiffs' research, acidophilus could not be easily introduced to milk without ruining the taste of the milk.

On 15 September 1972 plaintiff Speck informed the head of his department, Dr. Roberts, of his acidophilus research. Roberts suggested that he submit a proposal to the University Patent Committee for obtaining a trademark and marketing "Sweet Acidophilus" milk. The minutes of the Patent Committee meeting on 19 October 1972 reveal that,

> [Dr. Speck and Dr. Roberts] proposed to work through the North Carolina Dairy Foundation and employ a patent attorney to advise on the desirability of obtaining either a trademark or a copyright. Cost of the venture would be borne by the Dairy Foundation and a licensing of any trademark obtained would be handled through that organization. After a brief discussion by the Committee, which brought out that a patent application was not feasible, Mr. Conner moved that the request be approved and the motion was seconded by Dr. Bennett. Motion carried unanimously.

The University's Dean of the School of Agriculture and Life Sciences subsequently told the Dairy Foundation that, "the Patent Committee was applying for a patent on [sic] a trademark for the product through the Dairy Foundation."

Plaintiffs never executed an assignment of their ownership rights in the acidophilus process to the Dairy Foundation, the University, or anyone else. However, the University's Patent Policy clearly asserted University ownership of patentable inventions made by faculty members. The Patent Policy further stated, "The University will establish equitable arrangements with the inventor(s) for an appropriate share of the proceeds of any royalties realized from a patent so as to provide a reasonable encouragement to the inventor." The University traditionally awarded 15% of the royalties it received to the inventor.

Although plaintiffs' secret process for acidophilus milk was not patentable, all parties involved assumed the Patent Policy ap-

plied by analogy. Indeed, the Patent Committee revised the policy in 1976 to expressly cover trademarks and trade secret agreements. Plaintiff Speck and the defendants all initially assumed that ownership rights to the techniques plaintiffs developed were in the Dairy Foundation.

The University, Dr. Speck, and the Dairy Foundation worked together to obtain a trademark and market Sweet Acidophilus milk. The Dairy Foundation is a nonprofit organization that promotes University research on dairy products. It has its office on the University campus and one of its officers is a dean at the University. Dr. Speck and University officials helped the Dairy Foundation negotiate a contract for commercial production of acidophilus. The Dairy Foundation's Acidophilus Committee minutes of 9 January 1973 stated that University officials "would be kept informed of all pending actions and would be given the opportunity to review all agreements and contracts prior to execution." The Patent Committee and ranking University officials consistently maintained their desire to "work through" the Dairy Foundation to make Sweet Acidophilus milk a commercially viable product. With University support, Dr. Speck worked closely with the Dairy Foundation in marketing Sweet Acidophilus milk. Their marketing scheme proved successful and royalties began to accrue to the Dairy Foundation, as agreed by the University.

On 3 November 1975 Dr. Speck wrote to the head of his department to inquire about royalties. He felt the Dairy Foundation was the proper vehicle for marketing Sweet Acidophilus milk and also a proper agent of the University for receiving the royalties. However, Dr. Speck noted, participation by the inventor in the royalties had been overlooked.

Dr. Roberts passed Dr. Speck's request for royalties on to another University official, who, on 1 December 1975, replied that there was no basis for plaintiffs to share in the income from Sweet Acidophilus.

In a 8 October 1976 memorandum, Dr. Speck argued that he had not surrendered his rights as inventor, and that the University should make royalty payments to him in accord with the Patent Policy. The University's Legal Advisor stated a month later that since the plaintiffs' method of making Sweet Acidophilus milk was not patentable, all ownership rights were automatically

returned to the plaintiffs. This position was based on the following provisions of the Patent Policy:

[The Patent Committee] may at its discretion, cause the University's ownership rights to subsequent patents, if any, to be waived to the inventor if the Faculty Patent Committee is convinced that . . . (b) the invention is clearly one which is nonpatentable and which does not warrant referral to a patent management agency for evaluation.

The Legal Advisor further made the "assumption" that Dr. Speck had given his discovery to the Dairy Foundation since, despite the lack of any assignment of rights, Dr. Speck had not denied the rights belonged to the Dairy Foundation and had even recognized in a 1973 letter that the Dairy Foundation owned the rights.

On 23 January 1978 the Chairman of the University Patent Committee recommended to the Chancellor that a one-time payment of 15% of the royalty funds from Sweet Acidophilus be paid to Dr. Speck. The Chairman observed that such payments were an established procedure for faculty inventions, and that another professor in the Food Science Department had recently received such a payment. The Chairman also mentioned that it would be prudent to get Dr. Speck to formally execute an assignment of his rights to Sweet Acidophilus upon receipt of a one-time payment. In a similar vein, Dr. Roberts recommended on 6 December 1979 that the Dairy Foundation "establish as soon as possible its rights with N. C. State University and the claims of the inventors" so it would be able to negotiate with commercial manufacturers.

The plaintiffs filed a complaint on 11 December 1981 asking for an equitable distribution of the royalties and a constructive trust to remedy the unjust enrichment of the defendants. The defendant Dairy Foundation moved for summary judgment on the ground that no genuine issue of material fact existed and that it was entitled to judgment as a matter of law. The other defendants moved for summary judgment on the ground that the three year statute of limitations period had expired before suit was filed. The trial court granted defendants' motions for summary judgment. Plaintiffs appealed.

*Boyce, Mitchell, Burns & Smith, by Lacy M. Presnell, III and Susan K. Burkhart, for plaintiff appellants.*

*Poyner, Geraghty, Hartsfield & Townsend, by Thomas L. Norris, Jr., Cecil W. Harrison, Jr., and David W. Long, for defendant appellee North Carolina Dairy Foundation, Inc.*

*Attorney General Edmisten, by Special Deputy Attorney General Edwin M. Speas, Jr. and Associate Attorney Thomas J. Ziko, for defendant appellees The Board of Governors of the University of North Carolina, The Board of Trustees of North Carolina State University, and The Acting Chancellor of North Carolina State University.*

PHILLIPS, Judge.

The central issue on appeal is whether plaintiffs' cause of action is barred by the three-year limitations period of G.S. 1-52. Because the record contains evidence supporting plaintiffs' allegations of a breach of fiduciary duty, we hold that their claim may fall under the ten-year limitations period of G.S. 1-56 and therefore summary judgment was not proper.

Summary judgment for the defendants is proper only if the evidence in the light most favorable to the plaintiffs shows no genuine issue of material fact and that the defendants are entitled to judgment as a matter of law. If the plaintiffs had merely made out a claim in contract, express or implied, or in fraud, then the defendants would be entitled to judgment based on the three-year statute of limitations in G.S. 1-52. However, plaintiffs' evidence raises a genuine issue of material fact as to whether the defendants had a fiduciary duty to the plaintiffs that they breached.

A confidential or fiduciary relationship "exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931). Whether such a relationship exists in any instance is determined by the specific circumstances of the case. When, as here, the circumstances governing the alleged relationship are in dispute, the issue is one of fact for the jury, rather than one of law for the court. *Moore v. Bryson*, 11 N.C. App. 260, 181 S.E. 2d 113 (1971); *Crew v. Crew*, 236 N.C. 528, 73 S.E. 2d 309 (1952).

Taken in the light most favorable to the plaintiffs, the evidence in the present case indicates Dr. Speck reposed a special confidence in the University and the Dairy Foundation to protect his interest in the secret process for making Sweet Acidophilus milk. Acting pursuant to the University's Patent Policy, Dr. Speck presented his secret process to the Patent Committee. He reasonably assumed that the University had ownership rights to his invention but that he would be equitably compensated as specified in the Patent Policy. The University did not inform him that the ownership rights were his. Instead, the Patent Committee approved his idea of marketing the invention through the Dairy Foundation. Plaintiffs understood the University to be turning its ownership rights over to the Dairy Foundation. The University, as their employer, was in a superior position to plaintiffs, who were in no position to question the course that the University chose to follow.

University officials claimed credit for the scientific and commercial success of Sweet Acidophilus, noting that the new milk product had been marketed through the Dairy Foundation. The University encouraged Dr. Speck to assist the Dairy Foundation in developing Sweet Acidophilus, and University officials worked directly with the Dairy Foundation on this project. Evidence for the plaintiffs shows that the University exercised authority and control over the commercial development of plaintiffs' secret process, and that the plaintiffs entrusted their invention or discovery to the University for development.

The circumstances indicate the relationship was more than contractual. Plaintiffs turned their secret process over to their employer without asking for anything. Their primary concern was for the University to make the best use of acidophilus; they relied on the superior business and legal skills of the defendants for marketing acidophilus milk. Yet they understood from the Patent Policy that surrendering their legal ownership rights did not deprive them of an equitable or beneficial interest in their invention. By working with the defendants to develop Sweet Acidophilus long after they had acknowledged the legal ownership was in the defendants, they demonstrated their continued interest in their invention. Plaintiffs reposed a special confidence in the defendants by confidentially revealing a secret and valuable process to them, and the defendants' actions indicate they accepted

this trust. The minutes of the 28 October 1972 Dairy Foundation meeting show a University official stated that the Patent Committee was applying for the trademark through the Dairy Foundation. Thus, there is evidence that all the defendants assumed responsibility for the secret process despite the absence of any assignment of rights to them or contractual agreement. Plaintiffs' evidence supports their claim that they entrusted the defendants with their new techniques, and that there was neither any intent by plaintiffs to divest themselves of any equitable interest that they might have therein nor any bargaining with respect thereto.

The trust placed by the plaintiffs in the University also encompasses the Dairy Foundation. The Dairy Foundation essentially acted as an agent of the University for developing Sweet Acidophilus milk. These two organizations had an identity of interests since part of the Dairy Foundation's royalties from Sweet Acidophilus went to support further University research on this milk product. Moreover, the University and the Dairy Foundation shared the goal of using the royalties to promote dairy products and general research in the public interest. The two organizations had overlapping officers and office locations. They worked closely together in developing Sweet Acidophilus. The Dairy Foundation, nominal owner of the rights to Sweet Acidophilus, opened all its contracts and actions pertaining to the milk product to review by the University. University officials consistently stated they were developing Sweet Acidophilus for consumer markets by working through the Dairy Foundation, thereby implying an agency relationship. The interests and responsibilities of the University and Dairy Foundation were so tightly interwoven in developing Sweet Acidophilus that the actions of one may be fairly attributed to the other.

Plaintiffs have produced evidence that the defendants violated the trust or confidence reposed in them. The University has declined plaintiffs' request for a share of the royalties even though the Patent Committee Chairman recommended a $30,000 award to Dr. Speck. The Dairy Foundation received well over half a million dollars in Sweet Acidophilus royalites by June of 1980, with a portion of these proceeds going to the University to fund research. The defendants arguably had a fiduciary duty to set aside a fair share of the royalties for the plaintiffs since the defendants, acting in a position of superiority and trust, assumed

control of the secret process, the defendants took credit for the plaintiffs' innovations, the defendants traditionally gave 15% of the royalties to faculty inventors, and the defendants profited from the special confidence that plaintiffs reposed in them.

The viability of plaintiffs' claim depends upon the jury finding that a breach of fiduciary duty has occurred. Without this finding, plaintiffs will not have stated a claim that comes under the ten-year statute of limitations. But if there has been a breach of fiduciary duty, the ten-year limitation period of G.S. 1-56 will control since none of the other statutes of limitations expressly apply.

North Carolina courts have long held that a constructive trust arises out of the violation of a confidential or fiduciary relation, and that, as distinguished from an express trust, it is governed by the ten-year, rather than the three-year, statute of limitations. *Bowen v. Darden*, 241 N.C. 11, 84 S.E. 2d 289 (1954).

It is important to note, however, that a constructive trust is an equitable remedy, not a true trust. *Teachey v. Gurley*, 214 N.C. 288, 199 S.E. 83 (1938); D. Dobbs, Remedies § 4.3 (1973). The constructive trust remedy was created to prevent unjust enrichment and force restitution to the plaintiff of property that in equity and good conscience did not belong to the defendant. Dobbs, *supra*. The ten-year statute of limitations was originally applied to constructive trusts because the underlying cause of action was fraud or some similar wrongful act distinct from breach of contract. *Teachey, supra*. Today, the statute of limitations for fraud has been shortened to three years. G.S. 1-52. Nonetheless, North Carolina still seems to apply ten-year statutes of limitations to constructive trusts. *Cline v. Cline*, 297 N.C. 336, 255 S.E. 2d 399 (1979).

A decision as to which statute of limitation applies should be based on the nature of the substantive right that has been injured, not the remedy. G.S. 1-52 imposes a three-year limitations period for specific rights like those in contract and fraud, regardless of the remedy sought. By stating in G.S. 1-56, "All other actions, ten years" the General Assembly created a catch-all limitations period for substantive rights not enumerated in other statutes. It is irrelevant whether plaintiffs seek a constructive trust, or any other remedy, for purposes of determining the

statute of limitations. Instead, the statutes of limitation must be examined to find which one covers the substantive right plaintiffs are asserting; namely, a fiduciary duty owed by the defendants.

Defendants' alleged fiduciary duty was neither contractual nor the basis for fraud in the present case. Defendants made no promise that they could have breached; there was no agreement reached by the parties about plaintiffs' rights to their secret process or its royalties. Nor was there any allegation of intentional deceit. Plaintiffs' evidence simply shows they reposed a special confidence in the defendants, and the defendants did not act in good faith or fairness to look after the plaintiffs' interests. Since no statute of limitation expressly covers breaches of this type of fiduciary duty, they are governed by G.S. 1-56.

Though the decisions of our Supreme Court involving fiduciary relationships and the statutes of limitation are neither entirely clear nor consistent, as we understand them they nevertheless sanction our holding in this instance. In *Parsons v. Gunter*, 266 N.C. 731, 147 S.E. 2d 162 (1966), it was held that the three-year, rather than the ten-year, statute applied because plaintiff's claim was strictly contractual in nature and the evidence failed to establish a confidential relationship from which a constructive trust could arise. But here, plaintiffs' claim is not contractual and evidence was presented that a confidential or fiduciary relationship existed.

While some aspects of the decision in *Fulp v. Fulp*, 264 N.C. 20, 140 S.E. 2d 708 (1965) are not at all clear to us, and we doubt the validity of some of the statements made therein, which need not be analyzed here since they are irrelevant to this appeal, it is quite clear that in ruling that the three-year statute applied to the wife's claim against her husband based upon her funds being used to help build a house on a lot he had title to that the Court did so because the evidence showed her money was put into the house in reliance upon his express promise to have title to the property put in both their names. Thus, as in *Parsons*, the claim was essentially for breach of contract, rather than for breach of fiduciary duty, as in this case. Another distinguishing feature between this case and *Fulp* is that these plaintiffs claim an equitable interest in or title to the proceeds from a secret process that didn't exist before their work was done; whereas, in *Fulp*,

the plaintiff sought to recover money contributed to the pre-existing property of another.

Recent North Carolina decisions continue to say that an action for a constructive trust has a ten-year statute of limitations. *Tyson v. North Carolina National Bank,* 305 N.C. 136, 286 S.E. 2d 561 (1982); *Cline v. Cline, supra.* But the reasoning of these decisions indicates the court is determining the statute of limitations according to the substantive nature of the right involved. The *Cline* case held that defendant husband violated his fiduciary or confidential relationship to his plaintiff wife, giving rise to a constructive trust in her favor, and the court applied the ten-year statute. In *Tyson,* where plaintiff was the heir and beneficiary of an estate of which defendant was the executor and trustee, though the court agreed that there had been a breach of fiduciary duty, it applied the three-year statute of limitations because defendant had violated an express trust, for which contract damages rather than a constructive trust were the proper remedy. *Cline* and *Tyson* together stand for the proposition that breach of fiduciary duty may give rise to an action in contract or may be an independent cause of action, depending on the circumstances.

*Cline* provides the best precedent for the present case since both involve breach of fiduciary duty without a contractual basis. Unlike *Tyson,* no express trust exists in the present case.

Defendants also argue that breach of fiduciary duty constitutes a form of fraud; however, breach of fiduciary duty is "constructive fraud," which differs from actual fraud in that it does not require the element of intentional deceit. *Link v. Link,* 278 N.C. 181, 179 S.E. 2d 697 (1971); *Miller v. First National Bank of Catawba County,* 234 N.C. 309, 67 S.E. 2d 362 (1951). The distinction is so great Dobbs finds the term "constructive fraud" to be misleading. Dobbs, *supra,* § 10.4. Breach of fiduciary duty occurs when there is unfair dealing with one to whom the defendant has an active responsibility; it requires a special relationship unlike actual fraud. Thus, although actual fraud and constructive fraud share the name of "fraud," they are different causes of action which should come under different statutes of limitation.

Under the foregoing analysis, plaintiffs have stated a claim for breach of fiduciary duty which is not in the nature of a breach of contract or actual fraud. Accordingly, the ten-year limitations

period of G.S. 1-56 should apply. Yet even if this Court were to determine the statute of limitations issue according to whether plaintiffs had grounds for a constructive trust remedy, the plaintiffs must prevail on appeal.

A constructive trust may arise where there has been a breach of fiduciary duty. *Cline v. Cline, supra.* In such cases, the ten-year statute of limitations has been held to apply. *Id.* Defendants argue that a constructive trust requires a property interest, and that the trade secret in the present case is not a property interest, so the ten-year limitation period for constructive trusts cannot be invoked. We disagree. As an equitable remedy the constructive trust is quite flexible and may be used to recover profits or other unjust enrichment stemming from a fiduciary's misuse of confidential information.

The general rule is that, "One in a special relationship clearly should not profit at the *expense* of his beneficiary." (Emphasis in original.) Dobbs, *supra,* § 10.4. Dobbs identifies two pertinent fact situations where the preceding rule applies: (1) an employee owes a fiduciary duty of loyalty to his employer not to divulge a trade secret or take inside information for his own use, and (2) a person generates an idea and submits it to a business for development with the expectation of being paid. *Id.* at § 6.6. The present case involves elements of both these situations. A confidential relationship and duty of loyalty arguably existed between plaintiff employees and the defendant employer when defendant was entrusted with the commercial development of plaintiffs' secret process. The plaintiffs' process for introducing acidophilus into milk is in the nature of a trade secret. As such, the defendants have a duty to share profits with the plaintiffs if the jury finds a confidential relationship: "What is protectible is not property, but the confidential relationship and duty of loyalty owed by those who receive confidential information. Thus the trade secret need not be patentable or copyrightable to deserve the [defendants'] duty of loyalty concerning it." *Id.* at § 10.5. A constructive trust may be imposed to recover profits that unjustly enrich a defendant who misuses confidential information. *Id.* Dobbs carefully notes that where the defendant is not a conscious wrongdoer, equitable restitution should be limited to the gains unjustly derived from the trade secret itself, as opposed to any share of prof-

its attributable to the efforts, capital, and skill of the defendant. *Id.*

This Court has cited Dobbs' analysis with approval. In *Travenol Laboratories, Inc. v. Turner*, 30 N.C. App. 686, 228 S.E. 2d 478 (1976), this Court stated that disclosure of confidential information obtained through an employer-employee relationship was a tort in which the duty derives from the relationship of trust and confidence, not from property rights in the information.

The remedy sought in the *Travenol Laboratories* case was an injunction, but it is equally clear that a constructive trust may lie in cases of fiduciary self-dealing. *Anderson Cotton Mills v. Royal Manufacturing Co.*, 221 N.C. 500, 20 S.E. 2d 818 (1942), held that a fiduciary must account by way of constructive trust for any personal pecuniary advantage acquired when acting in his fiduciary character.

Defendants contend, in contradiction to the preceding authorities, that the *Fulp* decision requires title to property to be at issue before a constructive trust may be imposed. *Fulp* does not state that the ten-year statute of limitations for constructive trusts applies *only* if title to property is at issue. Instead, it holds that in the context of a dispute over real estate the plaintiff must state a claim for equitable ownership in the real estate, not simply a claim for money had and received, if legal title is to be conveyed to the plaintiff through a constructive trust. North Carolina law on constructive trusts, including the *Anderson Cotton Mills* and *Fulp* decisions, has received academic attention in an article that stresses the breach of duty over the need for a formal property right as the basis of a constructive trust. Lauerman, *Constructive Trusts and Restitutionary Liens in North Carolina*, 45 N.C. L. Rev. 424, 436 (1967), states:

> If there is a fiduciary or confidential relationship between the parties established by an agreement or otherwise, there need have been no trust *res* in existence at the time the fiduciary relationship was created in order to support a subsequent constructive trust. It is enough if the fiduciary or confidant has acquired any pecuniary advantage to himself through his special relationship. Hence, a constructive trust in North Carolina is primarily a tool to enforce a fiduciary duty.

This analysis makes sense because a constructive trust is not a true trust. It does not require a *res* or other incidents of true trusts. It is strictly an equitable remedy for providing restitution to the plaintiff where the defendant had been unjustly enriched.

Defendant Dairy Foundation also claims that summary judgment was properly based on plaintiffs' waiver or abandonment of their rights. Plaintiffs did acknowledge in 1973 and 1974 that the Dairy Foundation owned the rights to the acidophilus processing technique. However, if the jury finds that plaintiffs entrusted their secret process to defendants on the basis of a confidential or fiduciary relationship, then plaintiffs' acknowledgment of legal title in defendants does not establish waiver or abandonment. Plaintiffs would retain their equitable interest. Waiver is the intentional relinquishment of a known right. *Jones v. Home Security Life Insurance Co.*, 254 N.C. 407, 119 S.E. 2d 215 (1961). Similarly, abandonment of property requires intent. *Miller v. Teer*, 220 N.C. 605, 18 S.E. 2d 173 (1942). Plaintiffs' evidence shows they did not know of their ownership rights; they believed that under the Patent Policy the University had ownership and they had rights only to an "equitable arrangement" consisting of 15% of the royalties. The issue of waiver or abandonment depends on the same findings as the issue of breach of confidential relationship: if the jury finds that plaintiffs entrusted their secret process to defendants with the expectation that defendants would protect their interest in a fair share of the royalties, then no waiver or abandonment occurred.

Reversed and remanded.

Judge WELLS concurs.

Judge HEDRICK dissents.

Judge HEDRICK dissenting.

The majority grounds its decision on what it perceives to be a breach of a fiduciary relationship that gives rise to an equitable proceeding to establish a constructive trust. The record discloses that there is not now and never has been a "fiduciary relationship" between the defendants and plaintiffs, and the law will not and the court cannot declare that any of the defendants holds the

property in question or any profits realized therefrom in trust for the plaintiffs.

I vote to affirm summary judgment for the defendants.