LINDA CADE WATTS, KIM WATTS, AND GEORGE WATTS v. CUMBERLAND COUNTY HOSPITAL SYSTEM, INC.; DR. JAMES ASKINS; DR. RALPH MORESS; NORTH CAROLINA BAPTIST HOSPITALS, INC.; DR. VICTOR KERANEN; DR. W. C. MILLER; DR. MENNO PENNICK; DR. EBAN ALEXANDER, JR.; DR. JAMES TOOLE; AND DAN HALL

No. 384A85

(Filed 3 June 1986)

1. **Fraud § 12; Physicians, Surgeons and Allied Professions § 16.1— constructive fraud by physicians—insufficient evidence**

Plaintiff's allegations that she was at one time under the care of each defendant-physician was sufficient to allege a fiduciary relationship in support of a claim for constructive fraud. However, plaintiff failed to produce a sufficient forecast of evidence to support a claim based upon constructive fraud by defendants in concealing from her the alleged fact that X rays taken shortly after her 1974 automobile accident revealed a number of fractures which had not been discovered at the time the X rays were taken where the evidence showed that plaintiff sought and received numerous second opinions from other specialists as to the source of her complaints, since this evidence dispels the presumption of reliance and intentional deceit that arises from the fiduciary relationship itself.

2. **Fraud § 12; Physicians, Surgeons and Allied Professions § 16.1— fraudulent concealment by physicians—insufficient evidence**

Plaintiff's forecast of evidence was insufficient to support her claim against four physicians for actual fraud in concealing from her the alleged fact that X rays taken shortly after her 1974 automobile accident revealed a number of fractures in the cervical and lumbar regions of her spine which had not been discovered when the X rays were taken where the evidence showed that one physician did not even meet plaintiff until two years after she was told by another doctor in 1979 that spinal fractures were apparent on earlier X rays; plaintiff presented no evidence suggesting that fractures were apparent on the X rays taken in the short period between her June 1974 accident and the termination of plaintiff's care by two other physicians, and even if such X rays revealed fractures, plaintiff offered no evidence that these two physicians actually examined those X rays or discovered the breaks; plaintiff offered no evidence that the fourth physician ever examined either plaintiff's 1974 X rays or 1976 X rays purportedly showing the fractures; and evidence that all four

physicians concluded that plaintiff's pain had at least some psychological underpinnings did not sustain the element of intentional deceit necessary to a claim sounding in fraud.

ON petition for discretionary review by plaintiff Linda Cade Watts and appeal of right by defendants Menno Pennink and James Toole of the decision of a divided panel of the Court of Appeals, 74 N.C. App. 769, 330 S.E. 2d 256 (1985), which affirmed in part and reversed in part orders signed by *Johnson, J.,* on 14 October 1983, in Superior Court, CUMBERLAND County. Heard in the Supreme Court 12 March 1986.

*Hedahl & Radtke, by Joan E. Hedahl, for plaintiff Linda Cade Watts.*

*Patterson, Dilthey, Clay, Cranfill, Sumner & Hartzog, by Robert M. Clay and H. Lee Evans, Jr., for defendants Menno Pennink, Victor Keranen, and Ralph Moress.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, by James D. Blount, Martha Jones Mason, and Susan Milner Parker, for defendant James Toole.*

MARTIN, Justice.

The record before this Court indicates the following facts:

On 7 June 1974 Linda Cade Watts was injured in an automobile accident. She was treated at the emergency room at Cape Fear Valley Hospital, where X rays were made of her right arm, right knee, sternum, and ribs. She was released the same day. Between 10 June and 2 July Mrs. Watts was seen five times by a physician in Laurinburg, North Carolina, for complaints of pain in a number of sites, including her neck and back.

In early July Mrs. Watts revisited the emergency room because of persistent pain in her left knee and pain in her neck and in the back of her head. Mrs. Watts returned to the hospital the next day. Additional X rays were taken, and she was examined and admitted by Dr. Victor Keranen. His admission notes remarked upon her medical history, including her involvement in the automobile accident, her visits to the emergency room, her symptoms of headaches, staphylococcal infections, borderline diabetes, a nerve-related skin rash, and previous history of a

psychiatric disorder.[1] During her hospital stay, Mrs. Watts was seen by a neurologist and by Dr. Ralph Moress, a psychiatrist, in addition to Dr. Keranen. Mrs. Watts avers that Dr. Moress spoke with her only twice — once to introduce himself and once the next day to complete her discharge. She was released from the care of Drs. Moress and Keranen on 18 July 1974. Dr. Moress's discharge summary reflected in part on the possibility of somatization or malingering, and it concluded with a final diagnosis of neck and back sprains and a hysterical personality disorder.

When Mrs. Watts's attorney later requested medical reports, Dr. Keranen responded that he felt such records would be of little help in Mrs. Watts's automobile accident case because "most of her hospital stay was related to a psychological condition which clearly antedated the automobile accident." A subsequent letter received in response to the attorney's repeated request summarized Dr. Keranen's admission notes and indicated that Mrs. Watts had been seen by Dr. Moress and that she had been treated with supportive therapy and subjected to a lumbar puncture.

On three occasions over the next four months, Mrs. Watts consulted an orthopedic surgeon, Dr. Askins, who later reported that he had examined X rays of Mrs. Watts's cervical spine and left knee and that he had found no bone or joint abnormalities. He diagnosed mild sprains to the cervical and lumbosacral regions of Mrs. Watts's spine, as well as contusions and abrasions, and he concluded that Mrs. Watts would suffer some discomfort for about eight weeks but that he did not suspect the injury would lead to permanent disability.

Mrs. Watts continued to suffer from a variety of symptoms and was seen periodically throughout 1975 and 1976 at Womack Army Hospital. These consultations and treatments were supplemented by visits in 1976 to neurosurgeons at North Carolina Memorial Hospital.

On 6 April 1976 Mrs. Watts was admitted to North Carolina Baptist Hospital. There she underwent a cervical myelogram, which revealed spurs but no narrowing of the spinal cord, and a lumbar myelogram, which was read as normal. Neurosurgeons

1. Mrs. Watts's complaint denies any such history of psychiatric disorder.

evaluating the cervical myelogram determined that surgery would be of no benefit to Mrs. Watts at that time.

In June of 1977 Mrs. Watts was seen for the first time by Dr. Menno Pennink. Dr. Pennink performed carpal tunnel surgery on Mrs. Watts's right wrist and ordered X rays, discograms, and a second myelogram. This myelogram revealed some degeneration of the lumbar discs. Dr. Pennink noted that Mrs. Watts's low back pain was probably "degenerative disc disease with some psychological overlay." Mrs. Watts continued to be seen by Dr. Pennink throughout the remainder of 1977. She also maintained her therapy and monitoring by physicians at Womack throughout this period.

Mrs. Watts returned to Dr. Pennink in the summer of 1978, complaining of cervical and coccyx pain. Dr. Pennink hospitalized Mrs. Watts and performed a cervical discogram, which was read as being normal. It was again Dr. Pennink's impression at this time that Mrs. Watts had "considerable psychological overlay."

In November of 1978, Mrs. Watts was hospitalized and extensively tested at Walter Reed Army Hospital. Her discharge diagnosis recognized "non-specific low back and cervical syndromes, without evidence of organic neurological deficit" and "suspect adjustment reaction to adult life."

Mrs. Watts's symptoms were followed by physicians at Womack through the remainder of 1978. On 20 May 1979, Dr. Gene Coin, a radiologist at Sandhills Diagnostic Center, performed a CT-scan of Mrs. Watts's lumbar region, observing "definite vertical wedge-shaped defects in the lower lumbar vertebral bodies." He examined the original cervical X rays (the lumbar films were missing) and reported that he believed these defects "represent residual changes from previous vertical fractures of L4 and L5 vertebral bodies." Dr. Coin told Mrs. Watts of his findings. Dr. Coin retracted these conclusions in 1981 after performing a repeat CT-scan that showed all lumbar discs to be within normal limits. His report included this note: "We believe this study to be accurate and that our earliest study, done in May 1979, was an error due to technical difficulties."

Mrs. Watts subsequently moved to Florida, where she was followed throughout the remainder of 1979 and through the

spring of 1980 by a neurosurgeon, who eventually sent her to the Mayo Clinic for testing. While in Florida, Mrs. Watts underwent a third and fourth myelogram, upon which discharge diagnoses of arachnoiditis and cervical spondylosis were based.

In May 1981 Mrs. Watts consulted Dr. James Toole, a neurologist at North Carolina Baptist Hospital, and was admitted for tests and evaluations. These included orthopedic, gynecological, and psychiatric and psychological examinations, as well as Dr. Toole's neurological examination. Dr. Toole diagnosed arachnoiditis and muscle wasting and neuropathic pain, all probably caused by Mrs. Watts's previous myelography. The discharge note signed by Dr. Toole indicated that psychologists and psychiatrists had felt that "this unfortunate woman [had] somehow developed a dependence on pain." Dr. Toole prescribed pain medication and referred Mrs. Watts to Dan Hall, a pastoral counselor. Mrs. Watts alleges in her complaint that Dr. Toole did not disclose the full extent of her injuries as he did not detail "the lumbar break." In addition, a radiology report issued at this time stated that compression fractures on Mrs. Watts's thoracic spine were "unchanged since 1976."

In 1982 Mrs. Watts and her husband and daughter filed a complaint against two hospitals, seven physicians, and Dan Hall, alleging medical malpractice, breach of fiduciary duty, and fraudulent concealment. The trial court heard and granted motions for summary judgment for the seven physicians and North Carolina Baptist Hospital based upon plaintiffs' untimely filing of their malpractice claims. In addition, the trial court granted summary judgment against plaintiffs' claims based on fraudulent concealment and breach of fiduciary duty. Linda Cade Watts alone perfected her appeal to the Court of Appeals, and her appeal addressed the single issue of fraudulent concealment as to the physicians only.

The Court of Appeals affirmed summary judgment as to Drs. Keranen and Moress, among others, and reversed as to Drs. Pennink and Toole. That court singled out Dr. Coin's May 1979 report on the CT-scan of Mrs. Watts's lumbar region as the sole evidence in support of an initial misdiagnosis. The Court of Appeals felt that this report would have enabled plaintiff to have survived a motion for summary judgment on a medical malpractice claim, but

that it was not sufficient to buoy up claims based upon fraudulent concealment as to Drs. Keranen and Moress. The appellate court differentiated plaintiff's case regarding Drs. Pennink and Toole by the more lengthy period that she was in their care and by the extensive test results and records available to them but not to the other defendants.

Summary judgment is appropriate (1) when a claim or defense is utterly baseless in fact, or (2) when the facts are indisputable but there is controversy as to a question of law. *Kessing v. Mortgage Corp.*, 278 N.C. 523, 533, 180 S.E. 2d 823, 829 (1971). There is no unsettled question of law in this case. This Court implicitly recognized a cause of action for fraudulent concealment under circumstances similar to those presented by this case in *Shearin v. Lloyd*, 246 N.C. 363, 98 S.E. 2d 508 (1957). In *Shearin*, as in the case sub judice, the plaintiff's claim for medical malpractice was barred by the three-year statute of limitations, and he failed to put forward sufficient evidence in support of his allegations of fraudulent concealment to withstand a judgment of involuntary nonsuit. Ordinarily, summary judgment is proper when the pleadings, depositions, affidavits, and answers to interrogatories show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Singleton v. Stewart*, 280 N.C. 460, 186 S.E. 2d 400 (1972). If the movant can prove that an essential element of the opposing party's claim is nonexistent or if he can show through discovery that the opposing party cannot produce evidence to support an essential element of his claim, his burden of establishing the absence of a triable issue is met. *Zimmerman v. Hogg & Allen*, 286 N.C. 24, 209 S.E. 2d 795 (1974). We find that defendants' motions for summary judgment were judiciously granted under all of these circumstances.

Plaintiff alleges that Drs. Moress, Keranen, Pennink, and Toole fraudulently concealed from her the alleged fact that X rays taken shortly after her 1974 accident revealed a number of fractures in the cervical and lumbar regions of her spine. There are two species of fraud — actual and constructive — and both are implicated in plaintiff's allegations.

Constructive fraud arises where a confidential or fiduciary relationship exists, and its proof is less "exacting" than that re-

quired for actual fraud. *Terry v. Terry*, 302 N.C. 77, 83, 273 S.E. 2d 674, 677 (1981); *Development Co. v. Bearden*, 227 N.C. 124, 41 S.E. 2d 85 (1947). When a fiduciary relation exists between parties to a transaction, equity raises a presumption of fraud when the superior party obtains a possible benefit. 37 Am. Jur. 2d *Fraud and Deceit* § 442, at 602 (1968). "This presumption arises not so much because [the fiduciary] has committed a fraud, but [because] he may have done so." *Atkins v. Withers*, 94 N.C. 581, 590 (1886). The superior party may rebut the presumption by showing, for example, "that the confidence reposed in him was not abused, but that the other party acted on independent advice." 37 Am. Jur. 2d *Fraud and Deceit* § 442, at 603. Once rebutted, the presumption evaporates, and the accusing party must shoulder the burden of producing actual evidence of fraud.

[1]  In stating a cause of action for constructive fraud, the plaintiff must allege facts and circumstances "(1) which created the relation of trust and confidence, and (2) led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff." *Rhodes v. Jones*, 232 N.C. 547, 549, 61 S.E. 2d 725, 726 (1950). Plaintiff has met these requisites in alleging that she was at one time or another under the care of each defendant, for this Court has recognized that the relationship of patient and physician is considered to be a fiduciary one, "imposing upon the physician the duty of good faith and fair dealing." *Black v. Littlejohn*, 312 N.C. 626, 646, 325 S.E. 2d 469, 482 (1985). Evidence put forward by plaintiff and defendants, however, amply demonstrates that plaintiff sought and received a number of second opinions as to the source of her complaints. Even if a presumption of fraud arises from the alleged benefit to defendants of buttressing their medical reputations, the history of plaintiff's seeking and acquiring numerous second opinions from several other specialists dispels the presumption of reliance and intentional deceit that arises from the fiduciary relation itself. Plaintiff has therefore failed to produce a sufficient forecast of evidence to support a claim based upon constructive fraud.

[2]  Proof of actual fraud requires that the plaintiff allege facts in support of five essential elements:

(1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party.

*Terry v. Terry*, 302 N.C. 77, 83, 273 S.E. 2d 674, 677 (quoting *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E. 2d 494, 500 (1974) ).

Assuming arguendo that Dr. Coin's 1979 report was correct and that spinal fractures were apparent on plaintiff's earlier X rays, a forecast of plaintiff's evidence must show that each defendant physician subject to this appeal concealed that material fact from her, intending to and succeeding in deceiving her as to the source of her pain and causing her the damage alleged — *i.e.*, years of aggravating, painful, and costly medical complications, as well as wage loss, familial distress, and unnecessary psychological counseling. It is not sufficient that plaintiff allege these elements in general terms nor that she merely allege facts from which fraud might be inferred; she must allege those facts which, if true, would constitute fraud. *Products Corporation v. Chestnutt*, 252 N.C. 269, 113 S.E. 2d 587 (1960).

It is obvious that such evidence is insufficient to support a claim of fraud as to Dr. Toole, for he did not even meet plaintiff until 1981 — two years after she was told by Dr. Coin of the contents of his report. She could not have been deceived as to a material fact of which she was already aware.

The evidence forecast by plaintiff's complaint and interrogatory answers is also insufficient as to Drs. Keranen and Moress, for plaintiff presents no evidence whatsoever suggesting that fractures or fissures were apparent on the X rays taken in the short period between her June 1974 accident and the termination of their care of her the following month. Even if such X rays were now available and even if they revealed the defects apparent in 1976 as noted in Dr. Coin's 1979 report and indicated in the 1979 radiology report from North Carolina Baptist Hospital, plaintiff offers no evidence that either Dr. Keranen or Dr. Moress actually examined those X rays or discovered the breaks. Merely to allege that those physicians breached a duty to examine the X rays and to discover the breaks (if any) is insufficient to withstand a motion for summary judgment on charges of fraud.

Dr. Pennink is the single defendant as to whom plaintiff's only evidence of discovered fractures has any relevance. However, plaintiff has proffered no evidence that Dr. Pennink ever examined either her 1974 X rays or the 1976 X rays implicated in Dr. Coin's and the radiology reports. Dr. Pennink may have had a duty to review these records; he may have had a duty to discover independently spinal defects allegedly apparent in the original X rays through tests he ordered for plaintiff over the three-year period she was in his care; he may have breached such duties. But these allegations do not describe any of the elements necessary to make out a cause of action for fraud.

In addition, although each of these physicians concluded that plaintiff's pain had at least some psychological underpinnings, such conclusions, while arguably offensive to the patient, appear to have been legitimate medical opinions. Such opinions cannot sustain the indispensable element of intentional deceit to a claim of relief sounding in fraud. *See Johnson v. Insurance Co.*, 300 N.C. 247, 266 S.E. 2d 610 (1980).

We therefore hold that plaintiff has failed to produce evidence sufficient to show a genuine issue as to any material fact regarding her allegations of fraudulent concealment on the part of the four defendant physicians, Drs. Keranen, Moress, Pennink, and Toole, and that the trial court was correct in granting their motions for summary judgment. We accordingly affirm that portion of the Court of Appeals decision upholding summary judgment as to Drs. Keranen and Moress, and we reverse that portion of the appellate court decision reversing the judgment of the trial court regarding Drs. Pennink and Toole.

Affirmed in part; reversed in part.