RHÔNE–POULENC AGRO
S.A., Plaintiff,

v.

MONSANTO COMPANY and Dekalb
Genetics Corp., Defendants.

No. 1:97CV1138.

United States District Court,
M.D. North Carolina.

April 1, 1999.

Michael E. Ray, Winston–Salem, NC, Timothy G. Barber, Charlotte, NC, John F. Morrow, Winston–Salem, NC, Richard D. Levin, Wilmington, DE, for plaintiff.

James Donald Cowan, Jr., Greensboro, NC, Robert N. Sayler, Washington, DC, John F. Lynch, Houston, TX, Daniel W. Fouts, Greensboro, NC, W. Winburne King, III, Greensboro, NC, for defendants.

## MEMORANDUM OPINION

TILLEY, District Judge.

This case comes before the Court on the Defendants' motions for summary judgment on several of Plaintiff Rhône–Poulenc Agro S.A.'s ("RPA") claims, (see DeKalb Mot.Summ.J. [Doc. # 216]; Monsanto Mot.Summ.J. [Doc. # 222] ), and on RPA's motion for summary judgment on Defendant DeKalb Genetics Corporation's ("DeKalb") Second Counterclaim, (RPA Mot.Summ.J. [Doc. # 225] ).

RPA's First Supplemental and Amended Complaint ("Complaint") contained six claims: (I) misappropriation of RPA technology by DeKalb and Defendant Monsanto Company ("Monsanto"); (II) breach of a 1991 agreement by DeKalb; (III) breach of the covenant of good faith and fair dealing as to a 1994 agreement by DeKalb; (IV) rescission of the 1994 agreement; (V) patent infringement against Monsanto and DeKalb; and (VI) antitrust violations against Monsanto and DeKalb. (See Compl. [Doc. # 68].) Count II was dismissed with prejudice pursuant to a stipulation approved by the Court on February 2, 1999. (See Stipulation of Voluntary Dismissal [Doc. # 242], at 1.) Both Defendants have filed motions to dismiss Count VI, which are under consideration by the Court. Discovery on Count VI has been postponed until after the Court rules on the motions. Therefore, of RPA's six claims, this Opinion will address only the Defendants' summary judgment motions for Counts I, III, IV, and V.[1]

---

1. It should be noted that the trial on the patent claim in Count V was bifurcated from the trial on the contract claims in Counts I, III, and IV.

DeKalb initially made two counterclaims: (1) RPA's breach of the 1994 agreement; and (2) RPA's breach of the 1991 agreement. (*See* DeKalb's Answer [Doc. # 78].) The first counterclaim was dismissed pursuant to a stipulation approved by the Court on February 2, 1999. (*See* Stipulation of Voluntary Dismissal [Doc. # 242], at 1.) Therefore, of the two counterclaims, this Opinion will address only RPA's summary judgment motion for the second counterclaim.

Finally, Monsanto initially made a single counterclaim for tortious interference. (Amended Answer and Countercl. [Doc. # 74].) However, this counterclaim was dismissed pursuant to a stipulation approved by the Court on February 2, 1999. (*See* Stipulation of Voluntary Dismissal [Doc. # 242], at 1.) Therefore, RPA's motion for summary judgment on this claim [Doc. # 227] is DISMISSED as MOOT.

For the reasons set forth below, Defendants' motions for summary judgment are DENIED as to Count IV. Decision regarding all other motions is postponed until after it is determined whether the 1994 agreement is rescinded.

### I.

RPA is "a leading worldwide manufacturer and vendor of diversified agricultural products, and is engaged in chemical and biotechnological research and development with particular interests in the area of weed control and crops." (Compl.[Doc.# 68], ¶ 6.) Monsanto manufactures and sells a diversified line of agricultural products as well, including herbicides, and is engaged in biotechnological research and development. (*Id.* ¶ 7.) DeKalb, which is at least partially owned by Monsanto,[2] (*id.* ¶ 3), is involved in agricultural genetics and biotechnology for seed, and is one of the largest seed suppliers in the United States, (*id.* ¶ 7). RPA and Monsanto compete directly with each other in the general agricultural market and par-

ticularly in the fields of herbicides and biotechnology. (*Id.* ¶ 8.)

This case involves sophisticated biotechnology and genetic engineering. However, for the purposes of these summary judgment motions, the essence of the case can be reduced to the following explanation. Monsanto produces an herbicide called Roundup, whose active ingredient is "glyphosate." Glyphosate is apparently a very powerful, yet relatively safe, herbicide that will kill all green foliage with which it comes into contact. This case revolves around the attempt to use genetic engineering to create corn that is tolerant to glyphosate herbicides, such as Roundup. The ability to grow glyphosate-tolerant corn would increase the efficiency of farmers, because they could spray glyphosate-herbicide over the entire crop of corn, killing all of the weeds but not damaging any of the corn plants.

In 1985, DeKalb and Calgene, Inc. ("Calgene") entered into an agreement for the joint development of crops containing Calgene's C–AroA gene that would make corn crops tolerant to glyphosate (the "1985 Agreement"). The 1985 Agreement called for the formation of a "Project Review Committee," composed of scientists from each company, that would have general oversight responsibility for the progress of each party under the agreement. It also provided for various royalty payments to be made by DeKalb to Calgene for products developed under the agreement. As part of the 1985 Agreement, DeKalb received an exclusive license for two patents of certain mutated genes (the "Comai" patents) in the field of use of corn. In 1991, RPA, DeKalb, and Calgene entered into an "Assignment and Assumption Agreement," (the "1991 Agreement") whereby RPA assumed Calgene's rights and obligations under the 1985 Agreement.

At a November 1992 meeting, RPA stated that it would provide to DeKalb new

---

**2.** RPA has asserted that Monsanto recently acquired DeKalb, and that DeKalb is now a wholly-owned subsidiary of Monsanto. (RPA

Opening Br.Supp.Mot.Summ.J. [Doc. # 226], at 1 n. 1.)

genetic material containing an OTP/maize double mutant EPSPS construct ("EPSPS construct").[3] At some point after that meeting DeKalb received the genetic material. Moreover, the record indicates that at this meeting RPA notified DeKalb of its decision to withdraw from at least some of its responsibilities under the 1985 and 1991 Agreements. There is a factual dispute as to the extent of this withdrawal, and as to the responsibilities of each party under the 1985 and 1991 Agreements afterwards. RPA claims that it was "generally suspending work on glyphosate tolerance," (RPA's Answering Br. [Doc # 246], at 3), while DeKalb asserts that RPA "ceased its participation in the joint project," (DeKalb Br.Supp.Mot.Summ.J. [Doc. # 217], at 4).

In late 1993 and early 1994, in a greenhouse, DeKalb succeeded in growing transformed corn plants containing RPA's EPSPS construct that were tolerant to Roundup herbicide at potentially commercial levels. On February 18, 1994, DeKalb sent RPA a report of its results, stating that:

> [W]e have now demonstrated tolerance in transgenic plants in the greenhouse to up to four times the field application recommended by Monsanto for tolerant corn! We will repeat these experiments in the field in the summer of 1994. It is obvious from these results that the mutant maize gene has been the key to success.

(DeKalb App. B. [Doc. # 219], Ex. 23.) RPA responded with a three sentence letter stating: "I thank you for the report on development of glyphosate resistant corn. The results look good. I hope they will be confirmed by the field experiments." (*Id.* at Ex. 24.) Then, on March 10, 1994, DeKalb sent RPA another letter that once again mentioned the summer field trials and the gains DeKalb had achieved in the greenhouse regarding the glyphosate tolerance of corn with the EPSPS construct. (*Id.* at Ex. 25.) In addition, that letter

requested RPA's opinion regarding the use of the EPSPS construct for other projects, and also requested a response to the "many questions" that need to be answered regarding the "recent success" of the EPSPS construct. (*Id.*)

DeKalb conducted field tests in the summer of 1994, and on September 6, 1994, DeKalb received results indicating that corn plants containing RPA's EPSPS construct were resistant to four-times the normal level of Roundup herbicide. The report from the field testing was not sent to RPA. Rather, on September 7, 1994, DeKalb sent RPA a letter which stated, in its entirety, that:

> As the results that we have obtained in maize with the glyphosate resistant double mutant maize gene provided by RPA to DEKALB have been very encouraging, we are interested in whether this gene would also function as a selective marker in soybeans. Is it possible for DEKALB to use this gene in soybeans as a selectable marker?
>
> I will await your answer.

(*Id.* at Ex. 26.) These letters seem to be the extent of the communications between DeKalb and RPA regarding the EPSPS construct and its introduction into corn lines.

Also during the summer of 1994, Calgene and RPA filed a patent infringement action against Monsanto in which Calgene and RPA accused Monsanto of using the patented technology contained in the Comai patents in making, using, and selling glyphosate resistant soybeans. Calgene owned the Comai patents, and RPA had certain exclusive rights under these patents in soybeans. DeKalb also had an interest in the litigation, because under the 1985 Agreement, DeKalb was the exclusive licensee of the Comai patents in the field of use of corn.

---

**3.** The EPSPS construct is the subject of the misappropriation and patent claims in this lawsuit.

In December 1994, two agreements were negotiated arising from these events. First, RPA, Calgene, and Monsanto agreed to a settlement of the patent litigation begun in July 1994. Monsanto paid $8 million in return for an exclusive license (shared with DeKalb) under the Comai patents, for use in all fields. Concurrent with this settlement process, RPA and DeKalb entered a new agreement (the "1994 Agreement") in which DeKalb agreed to share its exclusive license under the Comai patents in the field of use of corn with Monsanto. Under the 1994 Agreement, DeKalb was provided with $500,000, as its share of the Monsanto settlement proceeds. Moreover, the 1994 Agreement dissolved the 1985 and 1991 Agreements, and RPA granted DeKalb the "world-wide, paid-up right to use" various technologies, including the EPSPS construct, in the field of use of corn. The 1994 Agreement also gave DeKalb "the right to grant sublicenses to the aforementioned right to use."

DeKalb eventually developed a glyphosate-tolerant corn line from the EPSPS construct, named the "GA21 corn line." In January 1996, DeKalb and Monsanto entered an agreement to work together on a variety of projects, including glyphosate-tolerant corn, and DeKalb licensed the GA21 corn line to Monsanto. Subsequently, corn seeds containing the GA21 corn line were commercialized and marketed under the brand name "Roundup Ready." Sales of Roundup Ready corn seeds began in 1998.

## II.

Summary judgment is appropriate only if there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). The party opposing summary judgment may not rest on its pleadings, but must provide evidence or point to evidence already in the record, properly authenticated pursuant to Rule 56(e), that would be sufficient to support a jury verdict in its favor. *See* Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate if no reasonable jury could find for the party opposing summary judgment: the question at the summary judgment stage is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505. Rule 56(c) mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In considering the motion, a district court must consider the evidence and reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III.

In Count IV, RPA alleges that DeKalb failed to disclose to RPA the results of field tests conducted by DeKalb in the summer of 1994 that "successfully demonstrated for the first time that the transgenic corn plants incorporating RPA's genetic material produced commercially viable glyphosate resistant corn plants." (Compl. [Doc. # 68] ¶ 50.) The corn seed produced in these field trials formed the basis of what became the GA21 corn line. (*Id.*) RPA alleges that these results were "highly material information" that DeKalb had a duty to disclose to RPA, and that if DeKalb had revealed that information to RPA, RPA would not have entered into the Monsanto Settlement Agreement and the 1994 Agreement in December 1994 on the terms that it did. (*Id.* ¶ 59.) Therefore, RPA asserts that the 1994 Agreement should be rescinded because DeKalb's actions constitute fraud in the inducement to enter into the 1994 Agreement, (*id.* ¶ 60.), and because DeKalb's contractual and fiduciary duties required DeKalb to disclose the results of the field tests, (*id.* ¶ 58).

The parties agree that either Illinois or North Carolina law applies to the claim for rescission in Count IV.[4] (*See* DeKalb's Br. Supp.Mot.Summ.J. [Doc. # 217], at 9 n. 7; RPA's Answering Br. to DeKalb's Mot. Summ.J. [Doc. # 246], at 11–12 (citing to both North Carolina and Illinois law).) They avoid having to determine which law should apply because they agree that both states require similar showings to succeed on those claims.

Two possible bases for rescission created by DeKalb's alleged misconduct exist: constructive fraud and actual fraud. The Court will discuss each theory in turn.

### A.

■ Constructive fraud arises when a party to a confidential or fiduciary relationship breaches a duty which has been implied by law because of the special relationship between the parties. *See Cessna v. City of Danville*, 296 Ill.App.3d 156, 168, 693 N.E.2d 1264, 1272, 230 Ill.Dec. 513, 521 (1998); *Watts v. Cumberland County Hosp. Sys., Inc.*, 317 N.C. 110, 116, 343 S.E.2d 879, 884 (1986). When a fiduciary relationship exists, a presumption of fraud is raised when the superior party obtains a possible improper benefit from the relationship. *Watts*, 317 N.C. at 116, 343 S.E.2d at 884. RPA may raise this presumption if it demonstrates the facts and circumstances "(1) which created the relation of trust and confidence, and (2) led up to and surrounded the consummation of the transaction in which [DeKalb] is alleged to have taken advantage of [its] position of trust to the hurt of [RPA]." *Id.* (quoting *Rhodes v. Jones*, 232 N.C. 547, 549, 61 S.E.2d 725, 726 (1950)) (internal quotation marks omitted). Because RPA transferred the right to use the EPSPS technology to DeKalb in the 1994 Agreement, if RPA can demonstrate that De-Kalb stood in a fiduciary relationship to RPA, a presumption of fraud would be raised. "Where a transferee of property stands in a confidential or fiduciary rela-tionship to the transferor, it is the duty of the transferee to exercise the utmost good faith in the transaction and to disclose to the transferor all material facts relating thereto and his failure to do so constitutes fraud." *Vail v. Vail*, 233 N.C. 109, 63 S.E.2d 202 (1951); *see also Breeden v. Richmond Community College*, 171 F.R.D. 189, 196 (M.D.N.C.1997) ("Generally [a] legal duty to disclose will arise where a fiduciary relationship exists between the parties."); *Connick v. Suzuki Motor Co., Ltd.*, 174 Ill.2d 482, 500, 675 N.E.2d 584, 593, 221 Ill.Dec. 389, 398 (1996).

■ A fiduciary relationship sufficient for a constructive fraud claim "exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E. 896, 906 (1931); *see also Citicorp Sav. v. Rucker*, 295 Ill.App.3d 801, 809, 230 Ill.Dec. 153, 692 N.E.2d 1319, 1325 (1998) ("A fiduciary relationship giving rise to a duty of loyalty owed to the person for whom the fiduciary is acting exists when one person places trust and confidence in another who, as a result, gains influence and superiority over the other."). "Intent to deceive is not an essential element of such constructive fraud. Any transaction between persons so situated is watched with extreme jealousy and solicitude; and if there is found the slightest trace of undue influence or unfair advantage, redress will be given to the injured party." *Link v. Link*, 278 N.C. 181, 192, 179 S.E.2d 697, 704 (1971) (citations omitted); *see also People ex rel. Hawthorne v. Bartlow*, 111 Ill.App.3d 513, 518, 444 N.E.2d 282, 285, 67 Ill.Dec. 243, 246 (1983). "Confidential relationships are not limited to a purely legal setting but may be found to exist in situations which are moral, social, domestic, or merely personal." *Curl v. Key*, 311 N.C. 259, 264, 316 S.E.2d 272, 275 (1984); *see also Citi-*

---

4. Monsanto relies on DeKalb's arguments for summary judgment on Counts III and IV. (*See* Monsanto's Mem.Supp.Mot.Summ.J. [Doc. # 223], at 1 n. 1.)

*corp Sav.,* 295 Ill.App.3d at 809, 230 Ill. Dec. 153, 692 N.E.2d at 1325. Generally, in North Carolina and Illinois, there are two types of fiduciary relationships: (1) those that arise from "legal relations such as attorney and client, broker and client ... partners, principal and agent, trustee and cestui que trust," and (2) those that exist "as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other." *Abbitt,* 201 N.C. at 598, 160 S.E. at 906; *see also State Sec. Ins. Co. v. Frank B. Hall & Co.,* 258 Ill.App.3d 588, 597, 630 N.E.2d 940, 947, 196 Ill.Dec. 775, 782 (1994) ("A fiduciary relationship may arise as a matter of law by virtue of the parties' relationship, e.g., attorney-client, or it may arise as a result of the special circumstances of the parties' relationship where one places trust in another so that the latter gains superiority and influence over the former.")

■ The existence or nonexistence of a fiduciary duty is often a question of fact for the jury. *Speck v. North Carolina Dairy Found.,* 64 N.C.App. 419, 423, 307 S.E.2d 785, 789 (1983), *rev'd on other grounds,* 311 N.C. 679, 319 S.E.2d 139 (1984). However, as a matter of law, no fiduciary relationship exists in the instant case based upon "special circumstances" resulting in one party having "superiority and influence" over the other. In North Carolina, no fiduciary relationship exists between mutually interdependent businesses with equal bargaining positions who dealt at arms-length. *Tin Originals, Inc. v. Colonial Tin Works, Inc.,* 98 N.C.App. 663, 391 S.E.2d 831 (1990); *Stone v. McClam,* 42 N.C.App. 393, 257 S.E.2d 78 (1979). For example, as a matter of law, no fiduciary relationship was found between a manufacturer and its exclusive distributor, *Tin Originals, Inc.,* 98 N.C.App. at 665–66, 391 S.E.2d at 832–33, nor between a franchisee and its franchisor, *Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 347–48 (4th Cir.1998). "Only when one party figuratively holds all the cards—all the financial power or technical information, for exam-

ple—have North Carolina courts found that the 'special circumstance' of a fiduciary relationship has arisen." *Id.* at 348. RPA clearly has not forecast evidence that would show that DeKalb had the amount of control and domination required to form a fiduciary relationship outside that of the normal relationships recognized by law.

Similarly, in Illinois, each party to a business transaction guards its own interests, and no fiduciary duty exists. *State Sec. Ins. Co.,* 258 Ill.App.3d at 597, 630 N.E.2d at 947, 196 Ill.Dec. at 782. The relevant factors in determining whether a fiduciary relationship exists include: "the degree of kinship between the parties; the disparity in age, health, mental condition and education and business experience between the parties; and the extent to which the "servient" party entrusted the handling of its business affairs to the "dominant" party and placed trust and confidence in it." *Id.* Generally, where the parties to a purported fiduciary relationship deal with each other at arm's length, the party allegedly subject to influence is fully capable of attending to its business affairs, and there is no evidence that the alleged fiduciary agreed to exercise its judgment on behalf of the alleged dependent party, no fiduciary relationship is deemed to exist. *DeWitt County Pub. Bldg. Comm'n v. County of DeWitt,* 128 Ill.App.3d 11, 26, 469 N.E.2d 689, 700, 83 Ill.Dec. 82, 93 (1984).

In "special relationship" cases under Illinois law, the plaintiff has the burden of establishing the existence of a fiduciary relationship by clear and convincing evidence. *Ransom v. A.B. Dick Co.,* 289 Ill.App.3d 663, 672, 682 N.E.2d 314, 321–22, 224 Ill.Dec. 753, 760–61 (1997). RPA has not demonstrated sufficient facts to construe its relationship with DeKalb as one in which DeKalb had "superiority and influence," such that DeKalb would owe RPA a fiduciary duty. Rather, the evidence tended to show that these businesses were sophisticated, independent companies that combined their resources

on a relatively equal basis toward a common goal. Therefore, a fiduciary relationship in the instant case will be found only if RPA and DeKalb engaged in a relationship in which fiduciary duties are implied by law.

■ RPA asserts (1) that a joint venture was created by DeKalb and RPA either under the 1985 and 1991 Agreements or under a separate oral agreement; and (2) that joint venturers owe each other a fiduciary duty. (RPA Answering Br. [Doc. # 246], at 12.) RPA is correct that a fiduciary relationship exists between members of a joint venture, as a matter of law. *Reese v. Melahn,* 53 Ill.2d 508, 513, 292 N.E.2d 375 (1973). Therefore, the Court must examine whether a reasonable jury could determine that DeKalb and RPA were engaged in a joint venture that would require DeKalb's disclosure of the field test results.

■ In Illinois,[5] a joint venture is

an association of two or more persons [or entities] to carry out a single enterprise for profit. A formal agreement is not essential to establish a joint venture. Rather, the existence of a joint venture may be inferred from the facts and circumstances demonstrating that the parties in fact entered into a joint venture. In determining whether a joint venture exists, the intent of the parties is the most significant element.

*O'Brien v. Cacciatore,* 227 Ill.App.3d 836, 843, 591 N.E.2d 1384, 1388–89, 169 Ill.Dec. 506, 510 (1992) (citations omitted). The following elements must be present for a joint venture to exist: (1): an agreement, either express or implied, to carry on a single enterprise with a legitimate purpose; (2) a community of interest in the purpose; (3) expectation of profits; (4) duty to share profits and losses; and (5) the right of each person to direct and govern the conduct of the other members of the venture. *Pinkowski v. Coglay,* 347

F.2d 411, 413 (7th Cir.1965); *O'Brien,* 227 Ill.App.3d at 843, 591 N.E.2d at 1389, 169 Ill.Dec. at 511. The burden of proving that a joint venture exists is on the party claiming that such a relationship exists, and whether or not a joint venture exists typically is a question of fact for the trier of fact. *O'Brien,* 227 Ill.App.3d at 843, 591 N.E.2d at 1389, 169 Ill.Dec. at 511.

■ DeKalb asserts that RPA fails to meet two of these elements because (1) the 1985 and 1991 Agreements did not contemplate the equal sharing of profits and losses, and (2) the Agreements did not provide any joint measure of control. (*See* DeKalb Br.Supp.Mot.Summ.J. [Doc. # 217], at 13–14.) However, RPA successfully demonstrated that a reasonable jury could interpret various provisions of the 1985 Agreement to create a joint venture. For example, Article 4.00 provided for profit-sharing through royalty provisions that increased with the success of their technological development. (RPA Answering Br. [Doc. # 246], at 13.) Moreover, losses would be shared because no provision mandated compensation by one party to the other if the project failed. (*Id.*) Additionally, the 1985 Agreement provided for a "Project Review Committee" comprised of members of both parties, who had "general oversight responsibility for the progress of each party." (*See id.* (citing ¶¶ 6.1–6.4 of 1985 Agreement).) Other forms of mutual control are detailed by RPA, including reporting and consultation requirements for each party. (*Id.*) Finally, despite DeKalb's assertion that the 1985 Agreement expressly precluded the formation of a joint venture, (*see* DeKalb Reply Br. [Doc. # 258], at 3), the plain language of the Agreement never makes such an assertion. Instead, the Agreement states that the "parties hereto desire to jointly develop certain seeds of corn containing the aroA gene ... and to market certain of such seed." (*See* De-

---

5. The Court will rely solely on Illinois law to determine whether the 1985 and 1991 Agreements created a joint venture because Article 8.9 of the 1985 Agreement contains a choice of law provision declaring Illinois law as the applicable law. (*See* DeKalb App. B. [Doc. # 219], Ex. 1, at 19.)

Kalb App. B. [Doc. # 219], Ex. 1, at 2.) Such language buttresses RPA's assertion that a joint venture was created by the 1985 and 1991 Agreements, and helps create a genuine issue of material fact as to whether the parties intended to create a joint venture.

If the EPSPS construct was transferred pursuant to an oral agreement made at the November 2, 1992 meeting, and not pursuant to the 1985 and 1991 Agreements as also suggested by RPA, then a joint venture could still be found with regard to the EPSPS construct. A jury could find that the oral agreement contained the same or similar terms as the 1985 and 1991 Agreements, and therefore, if those Agreements created a joint venture, then the new agreement could create a joint venture as well. In other words, "[a] previous course of dealing may give meaning to or qualify an agreement. The prior course of dealing between the parties may be considered in determining the terms of an oral contract." *H & H Press, Inc. v. Axelrod*, 265 Ill. App.3d 670, 677, 638 N.E.2d 333, 338, 202 Ill.Dec. 687, 692 (1994) (citations omitted). A reasonable jury could conclude that RPA would not merely give the EPSPS construct to DeKalb without some continued understanding that DeKalb would report its results to RPA.

Additionally, RPA attempts to create a fiduciary relationship from the fact that RPA and DeKalb were both members of a "consortium" that negotiated a settlement with Monsanto over the Comai patents in December 1994. According to RPA, this consortium established a separate fiduciary relationship between RPA and DeKalb. (RPA Answering Br. [Doc. # 246], at 14.) Moreover, RPA asserts that one of DeKalb's attorneys, Doug Fisher, owed RPA a fiduciary duty because he negotiated with Monsanto on behalf of the consortium. (*Id.*) However, the facts demand the conclusion that a fiduciary relationship did not arise from either of these relationships with regard to the EPSPS construct or the field tests. The consortium's purpose was to negotiate with Monsanto over the Comai patents. Any fiduciary duty that arose

because of the consortium's activities would pertain only to the Comai patents and to the consortium's potential lawsuit against Monsanto for infringement of those patents. In contrast, RPA is attempting to impose upon DeKalb a "duty to disclose" that relates to the EPSPS construct, which is an entirely different venture from the consortium's activities. Similarly, if Doug Fisher owed any fiduciary duty to RPA based upon his negotiations with Monsanto, the scope of that duty would not include a duty to disclose field results from different genetic materials. Also, RPA removed Mr. Fisher from the negotiations, and took over much of the responsibilities itself, while it was represented by its own attorneys. Therefore, the consortium activities and Doug Fisher's alleged attorney relationship with RPA do not provide the necessary confidential or fiduciary relationship to give rise to a duty to disclose.

In conclusion, a reasonable jury could determine that DeKalb and RPA were engaged in a joint venture, either from the 1985 and 1991 Agreements or from the oral agreement made in November 1992. As noted above, a fiduciary relationship would require DeKalb to disclose material information regarding its venture with RPA. *Breeden v. Richmond Community College*, 171 F.R.D. 189, 196 (M.D.N.C. 1997). As the Court determines that a reasonable jury could find the results of the field tests to be material, *see infra* Part III(B), DeKalb's motion for summary judgment as to the constructive fraud claim is DENIED.

### B.

The elements of an actual fraud claim are: (1) a false representation or concealment of a material fact; (2) that was reasonably calculated to deceive; (3) which was made with the intent to deceive; (4) that did in fact deceive (or reasonably induce reliance); and (5) resulted in injury or damage. *Lagen v. Balcor Co. et al.*, 274 Ill.App.3d 11, 17, 210 Ill.Dec. 773, 653

N.E.2d 968, 972 (1995); *Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 568, 374 S.E.2d 385, 391 (1988). The Defendants assert that RPA cannot satisfy any of the first four elements. (DeKalb Br.Supp.Mot.Summ.J. [Doc. # 217], at 10.)

 Although the parties have asserted that North Carolina and Illinois law are interchangeable, it appears that their laws differ on the burden of proof required for fraud claims. In North Carolina, for rescission cases, the plaintiff must establish each element by a preponderance or the greater weight of the evidence. *Maynard v. Durham & Southern Ry. Co.*, 251 N.C. 783, 787, 112 S.E.2d 249, 252 (1960), *rev'd on other grounds*, 365 U.S. 160, 81 S.Ct. 561, 5 L.Ed.2d 486 (1961). Under Illinois law, the Illinois standard of proof in fraud cases is "clear and convincing." *Kinsey v. Scott*, 124 Ill.App.3d 329, 463 N.E.2d 1359, 1364, 79 Ill.Dec. 584, 589 (1984). Although the Defendants assert that RPA's evidence must be "clear, strong, and convincing," even under North Carolina law, (*see* DeKalb's Br. Supp.Mot.Summ.J. [Doc. # 217], at 10 (citing *Wilson v. Popp Yarn Corp.*, 680 F.Supp. 208, 214 (W.D.N.C.1988))), in North Carolina, the "clear and convincing" standard is used only if the action is to reform an instrument. *Maynard*, 251 N.C. at 787, 112 S.E.2d at 252. Here, because RPA is asking the Court to rescind, or set aside, the 1994 Agreement because of fraud, the lesser burden of "preponderance of the evidence" would apply under North Carolina law. *Id.* As noted *infra*, RPA would survive summary judgment under either standard, so a final determination of the proper burden need not be made until trial.

### (1).

 RPA does not allege that DeKalb made any statement that, taken alone was false or contained a misrepresentation. Rather, RPA claims that DeKalb had a duty to disclose the results of the field tests to RPA, and DeKalb's nondisclosure of those results resulted in a fraudulent concealment or omission by DeKalb.[6] In both North Carolina and Illinois, fraud can be practiced by silence as well as by a positive misrepresentation, if a duty to speak exists. *Lefebvre Intergraphics, Inc. v. Sanden Mach. Ltd.*, 946 F.Supp. 1358, 1367 (N.D.Ill.1996) (citing Illinois law); *Setzer v. Old Republic Life Ins. Co.*, 257 N.C. 396, 399, 126 S.E.2d 135, 137 (1962).

> Silence, in order to be an actionable fraud, must relate to a material matter known to the party and which it is his legal duty to communicate to the other contracting party, whether the duty arises from a relation of trust, from confidence, inequality of condition and knowledge, or other attendant circumstances ... the silence must, under the conditions existing, amount to fraud, because it amounts to an affirmation that a state of things exists which does not, and the uninformed party is deprived to the same extent that he would have been by positive assertion.

*Setzer v. Old Republic Life Ins. Co.*, 257 N.C. 396, 399, 126 S.E.2d 135, 137 (1962) (quoting 23 Am.Jur., Fraud and Deceit, Section 77) (internal quotation marks omitted); *see also Connick v. Suzuki Motor Co., Ltd.*, 174 Ill.2d 482, 500, 675 N.E.2d 584, 593, 221 Ill.Dec. 389, 398 (1996) (noting that a duty to disclose arises when parties are in a fiduciary or confidential relationship, and also where plaintiff places trust and confidence in defendant, giving defendant a position of influence and superiority).

 RPA has alleged that DeKalb was under several "legal duties" to disclose the results of the field tests to RPA: a fiduciary relationship based upon either the parties' alleged joint venture relationship, the parties' consortium, or an attorney-client relationship; DeKalb's contractual obligations toward RPA; and DeKalb's superi-

---

6. Another of RPA's allegations—that DeKalb's September 7, 1994 letter misled RPA based on the parties' past correspondence and relationship—is discussed *infra*.

or knowledge, obtained by virtue of the RPA–DeKalb relationship of trust and confidence. (RPA's Answering Br. [Doc. # 216], at 12.) If the jury determines that a fiduciary relationship existed because of a joint venture between DeKalb and RPA, *see supra* Part III(A), then DeKalb certainly had the duty to disclose the field test results. *Breeden,* 171 F.R.D. at 196 ("Generally [a] legal duty to disclose will arise where a fiduciary relationship exists between the parties."). However, even if no joint venture relationship is found, RPA asserts that the jury may also find that DeKalb owed RPA a duty to disclose the results based either upon their contractual relationship or upon their "relation of trust [and] confidence, inequality of condition and knowledge, or other attendant circumstances." *Setzer,* 257 N.C. at 399, 126 S.E.2d at 137. This section will discuss whether any genuine issue of material fact has been raised regarding these possible relationships between DeKalb and RPA.

The first question is whether DeKalb had a contractual obligation to disclose the field test results. RPA seems to present two possible sources for this obligation: the 1985 and 1991 Agreements or a separate, oral contract beginning in November 1992 when RPA agreed to send DeKalb the EPSPS construct. If the source is the 1985 and 1991 Agreements, then there is evidence that DeKalb had a duty to keep RPA "apprised of [DeKalb's] efforts." (RPA's Answering Br. [Doc. # 246], at 15 (citing Fisher Dep. at 307).) DeKalb asserts that the 1985 and 1991 Agreements required them only to report results to the Project Review Committee, and once those meetings were abandoned by RPA, DeKalb had no obligation to continue reporting the results under the Agreements. (DeKalb Br.Supp.Mot.Summ.J. [Doc. # 217], at 12.) Yet, the facts surrounding RPA's withdrawal remain unclear, and do not necessarily lead to the conclusion that DeKalb would be relieved of its obligation to report its testing results. A jury could find it odd that the 1985 and 1991 Agreements would require RPA to provide the EPSPS construct to DeKalb after RPA had withdrawn from the Project Review Committee, yet DeKalb would not be required to provide any report of the results in return. Indeed, even if RPA withdrew from the Project Review Committee, as DeKalb alleges, Article 5.2 would seem to require that the "remainder of th[e] Agreement shall remain in full force and effect." (DeKalb App. B. [Doc. # 219], Ex. 1, ¶ 5.2.) Furthermore, a jury could infer an agreement from DeKalb's course of conduct in reporting its preliminary greenhouse results to RPA in February 1994.

Moreover, if the EPSPS construct were transferred under a separate, oral agreement, a factual question exists as to what the parties expected DeKalb to provide in return for that technology. Dr. Freyssinet from RPA stated that, at the time he agreed to give DeKalb the EPSPS construct, he told DeKalb he would like to have access to the results DeKalb obtained. Given the prior course of conduct between the parties, it would not be unreasonable for a jury to find that DeKalb agreed to provide the results in exchange for the new technology. In any event, a true factual controversy exists as to DeKalb's obligations to report its testing results from the EPSPS construct under either the 1985 and 1991 Agreements or the oral agreement about which Dr. Freyssinet testified.

The second issue is whether a duty to disclose material facts may arise if RPA placed trust and confidence in DeKalb, thereby placing DeKalb in a position of influence and superiority over RPA. *See Kurti v. Fox Valley Radiologists, Ltd.,* 124 Ill.App.3d 933, 938, 464 N.E.2d 1219, 80 Ill.Dec. 236 (1984). This standard seems to require the same showing for a "duty to disclose" as for a "special relationship" under fiduciary law, which was discussed above. *See id.* RPA has not cited to any case in which North Carolina or Illinois courts have recognized that a "special relationship" existed in factual circumstances similar to the instant case. As this Court decided that such a special relationship

does not exist in this case under a constructive fraud theory, *see supra* Part III(A), RPA will not be able to rely on the "special relationship" theory to require a duty to disclose under its actual fraud claim either.

A third issue is that courts have acknowledged a duty to disclose, which may arise without a fiduciary relationship, if one party makes a partial or ambiguous statement that requires additional disclosure to avoid misleading the other party. *See, e.g., Remington Rand Corp. v. Amsterdam–Rotterdam Bank, N.V.,* 68 F.3d 1478, 1483–84 (2d Cir.1995). Illinois courts have held that "while silence in a business transaction does not necessarily amount to fraud, silence accompanied by deceptive conduct or suppression of material facts results in active concealment, [cit.] and it then becomes the duty of the person to speak [cit.]." *Lefebvre Intergraphics, Inc. v. Sanden Mach. Ltd.,* 946 F.Supp. 1358, 1367 (N.D.Ill.1996) (citations and internal quotation marks omitted); *see also Heider v. Leewards Creative Crafts, Inc.,* 245 Ill. App.3d 258, 265, 613 N.E.2d 805, 811, 184 Ill.Dec. 488, 494 (1993). Similarly, North Carolina courts acknowledge that once a party speaks, it "must make full and fair disclosure as to the matter [it] discusses." *Ragsdale v. Kennedy,* 286 N.C. 130, 139, 209 S.E.2d 494, 501 (1974); *see also Breeden,* 171 F.R.D. at 196; *Freese v. Smith,* 110 N.C.App. 28, 35, 428 S.E.2d 841, 846 (1993); *Shaver v. N.C. Monroe Constr. Co.,* 63 N.C.App. 605, 614, 306 S.E.2d 519 (1983). RPA alleges that the September 7, 1994 letter "was a 'partial and ambiguous statement,' which misled RPA into believing that DeKalb had not had much success with its 1994 field trials." (RPA's Answering Br. DeKalb's Mot.Summ.J. [Doc. # 246] at 16 n. 19.) Furthermore, the September 7, 1994 letter, in combination with the February 1994 report and De-Kalb's subsequent letters, "created a belief that DeKalb was being forthright and honest, and was keeping RPA abreast of its material developments." (*Id.* at 19.) In other words, even if DeKalb did not have a duty to disclose the results of the field tests, *see* discussion *supra,* once DeKalb did speak, DeKalb had a duty to be straightforward and direct regarding the tests. *See Ragsdale,* 286 N.C. at 139, 209 S.E.2d at 501. As described in *Ragsdale,* when a party accused of fraud "undertook to describe the business as a 'gold mine' and a 'going concern' he incurred a concomitant duty to make a full disclosure of any extenuating financial circumstances which counteracted his positive assertions concerning the condition of the corporation." *Id.*

RPA has created an issue of material fact as to whether DeKalb's actions over the course of its business dealings with RPA created the reasonable belief that DeKalb would affirmatively disclose any and all significant results from testing of the EPSPS construct. Given DeKalb's past history of reporting its positive results to RPA without inquiry, it would be reasonable for a jury to conclude that the September 7, 1994 letter led RPA to believe that it was receiving, and would receive, all of the results of testing done with the EPSPS construct. For example, the statement in the September 7, 1994 letter that "the results ... we have obtained in maize with the glyphosate resistant double mutant maize gene provided by RPA to DEKALB have been very encouraging," may be interpreted reasonably to refer to the initial greenhouse testing of the construct, about which RPA already knew. Indeed, Dr. Freyssinet apparently did not grasp that the September 7, 1994 letter communicated that the field tests were a success. (*See* Freyssinet letter, DeKalb App. B. [Doc. # 219], Ex. 40.) Moreover, Dr. DeRose from RPA has stated under oath that he believes the September 7, 1994 letter

> merely restates and reconfirms the prior news that glyphosate worked as a selectable marker in a petri dish in a laboratory, and [DeKalb] was merely now requesting that we allow our genes to be used in petri dish experiments with soybeans (and not only corn as before). No

one could gather from the above letter that DeKalb had now discovered that our genes provided glyphosate tolerance in seed-grown corn in the field.

(DeRose Decl, Pl.'s Compendium of Declarations [Doc. # 248], at Ex. A ¶ 14.) In short, the silence of DeKalb could amount to a misrepresentation "because it amounts to an affirmation that a state of things exists which does not." *Setzer,* 257 N.C. at 399, 126 S.E.2d at 137. Therefore, an issue of material fact exists regarding whether DeKalb's silence about the field tests' results was misleading given the relationship and the correspondence between DeKalb and RPA.

In sum, a factual dispute exists regarding (1) whether DeKalb had a contractual duty to disclose the field test results, and (2) whether DeKalb made a disclosure so incomplete that it was misleading when considered in the context of the parties' course of dealing.

The next question to answer in order to satisfy the first element of actual fraud is whether the omission was material. "A false representation is material when it deceives a person and induces him to act." *Keith v. Wilder,* 241 N.C. 672, 675, 86 S.E.2d 444, 446 (1955). Stated differently, a false representation is material if the fact untruly asserted, or wrongfully suppressed if it had been known to the party, influenced the party's judgment or decision in entering into the contract. *See Heider v. Leewards Creative Crafts, Inc.,* 245 Ill.App.3d 258, 266, 613 N.E.2d 805, 812, 184 Ill.Dec. 488, 495 (1993); *Starnes v. Raleigh, C. & S. Ry.,* 170 N.C. 222, 87 S.E. 43 (1915); *White Sewing Mach. Co. v. Bullock,* 161 N.C. 1, 76 S.E. 634 (1912). RPA has presented evidence that the field test results were "an extraordinarily meaningful event." (Freeling Decl., Pl.'s Compendium of Declarations, Ex. B, ¶ 7.) Moreover, RPA has provided declaration testimony demonstrating that RPA would not have entered the 1994 Agreement under the same terms had the results been disclosed to RPA. (*See* Johnson Decl., Pl.'s Compendium of Declarations, Ex. C, ¶ 7.) RPA's evidence presents a genuine issue

of material fact regarding the materiality of the field test results.

(2)

■ The second and third elements that RPA must demonstrate are that DeKalb's omission was reasonably calculated to deceive and that it was made with the intent to deceive, respectively. A showing that DeKalb acted with the intent to deceive is an essential element of RPA's fraud claim. *See Myers & Chapman, Inc. v. Thomas G. Evans, Inc.,* 323 N.C. 559, 568, 374 S.E.2d 385, 391 (1988). However, a showing of intent sufficient to withstand summary judgment may be inferred from circumstantial evidence, and need not be shown by direct evidence. "The existence of fraud necessarily involves a question concerning the existence of a fraudulent intent on the part of the party accused of such fraud. The intent of a party is a state of mind generally within the exclusive knowledge of that party and, by necessity, must be proved by circumstantial evidence. Summary judgment is generally inappropriate under such circumstances." *Canady v. Mann,* 107 N.C.App. 252, 258, 419 S.E.2d 597, 601 (1992); *see also Szajna v. General Motors Corp.,* 115 Ill.2d 294, 322, 503 N.E.2d 760, 773, 104 Ill.Dec. 898, 911 (1986) ("Fraud is never presumed, but it may be inferred from the nature of the acts complained of."). In the instant case, intent to deceive may be inferred from the fact that DeKalb kept RPA updated and informed on all of DeKalb's research with the EPSPS construct until DeKalb actually discovered extremely positive results with the field tests. At that point, DeKalb sent RPA a brief letter that focused on another issue (asking for permission to use the gene with soybeans) and that did not mention the field test results specifically. Then, less than four months later, RPA— never having learned of the results from the field tests—transferred to DeKalb the right to use the EPSPS construct for arguably much less than its full value. From these facts, a reasonable jury could conclude that DeKalb actively misled RPA

with the intent to deceive it about the true value of the EPSPS construct.

(3)

The fourth element of a fraud claim is that the omission did in fact deceive (or reasonably induce reliance). DeKalb asserts that it was not reasonable for RPA to rely on DeKalb's omission because RPA failed to satisfy a "duty of inquiry" prior to signing the 1994 Agreement. There is no doubt, as DeKalb contends, that the law requires an individual to exercise ordinary prudence in relying upon persons with whom they conduct their business affairs. "The question is whether it is better to encourage negligence in the foolish or fraud in the deceitful.... Just where reliance ceases to be reasonable and becomes such negligence and inattention that it will, as a matter of law, bar recovery for fraud is frequently very difficult to determine." *Johnson v. Owens*, 263 N.C. 754, 757–59, 140 S.E.2d 311, 313–15 (1965). This case presents that difficulty, and therefore, the question whether RPA should have inquired about the field test results is better left for resolution by the jury. *See Rowan County Bd. of Educ. v. United States Gypsum Co.*, 103 N.C.App. 288, 294, 407 S.E.2d 860, 863 (1991) ("We note, finally, that in fraud actions 'it is generally for the jury to decide whether plaintiff reasonably relied upon representations made by defendant.'" (quoting *Stanford v. Owens*, 46 N.C.App. 388, 395, 265 S.E.2d 617, 622 (1980))); *see also Sims v. Tezak*, 296 Ill. App.3d 503, 511, 694 N.E.2d 1015, 1020, 230 Ill.Dec. 737, 742 (1998)

IV.

The summary judgment motions for the claims in Count I and in Count III need not be decided at this time. Both claims involve an analysis of the 1994 Agreement, which may become moot if the Court rescinds the contract because the jury determines that the 1994 Agreement was procured by fraud. Count I of RPA's Complaint alleges that the Defendants are misappropriating RPA's technology. The Defendants respond that, among other things, they are entitled to use the technology under the licensing provision found in the 1994 Agreement. Count III alleges a claim against DeKalb for its alleged breach of a covenant of good faith and fair dealing as to the 1994 Agreement. Decisions on the summary judgment motions are unnecessary at this time, and therefore, the Court will not decide these matters until it becomes necessary to do so.

V.

Similarly, RPA's summary judgment motion regarding DeKalb's Second Counterclaim for breach of the 1991 Agreement need not be decided at this time. The parties agree that DeKalb's Second Counterclaim is contingent upon RPA prevailing on its claim for rescission of the 1994 Agreement, because the 1994 Agreement plainly released the parties from any claims under the 1985 and 1991 Agreements. (*See* DeKalb Resp. Opp'n. Summ. J. Mot. [Doc. # 243], at 2; RPA Br. Supp. Mot. Summ. J. [Doc. # 226], at 16.) Therefore, summary judgment is not appropriate until a decision is reached regarding RPA's claim for rescission.

VI.

In conclusion, the Defendants' Motion for Summary Judgment regarding RPA's claim for rescission under Count IV is DENIED. Decisions on the summary judgment motions regarding RPA's Counts I and III and DeKalb's Second Counterclaim are unnecessary at this time.