SARA LEE CORPORATION Plaintiff,

v.

QUALITY MANUFACTURING, INC.,
and Quality de Sabinas, S.A. de
C.V., Defendants.

No. 1L00CV01234.

United States District Court,
M.D. North Carolina.

April 19, 2002.

Kristen M. Major, Kilpatrick Stockton, L.L.P., Mark Andrew Stafford, Winston–Salem, NC, for Plaintiff.

Amiel J. Rossabi, Forman Rossabi Black Marth Iddings & Slaughter, P.A., Benjamin F. Davis, Jr., Smith Moore, L.L.P., Greensboro, NC, Shannon R. Joseph, Smith Moore, L.L.P., Raleigh, NC, Stephen McDaniel Russell, Bell Davis & Pitt, P.A., Winston–Salem, NC, Benjamin F. Davis, Jr., Smith Moore, L.L.P., Greensboro, NC,

*MEMORANDUM OPINION*

OSTEEN, District Judge.

This case involves the manufacture of shirts. Plaintiff claims that Defendants wanted the shirt off Plaintiff's back. Defendants counter that Plaintiff's representations caused them to bet their shirt, and the subsequent non-renewal left them shirtless. Each party has filed motions for summary judgment. For the reasons set forth below, both motions will be granted.

## I. BACKGROUND

### A. Factual Background

Plaintiff Sara Lee Corporation ("Sara Lee"), based in Winston–Salem, North Carolina, is engaged in the business of manufacturing and selling apparel.[1] Defendant Quality Manufacturing, Inc., a holding company organized in the British Virgin Islands, owns Defendant Quality de Sabinas, S.A. de C.V. (together "Quality"), a Mexico-based garment assembly operation. The parties began working together some time in the early 1990's. Pursuant to written agreements, Sara Lee would acquire and ship cut parts for shirts to Quality's facility in Mexico. Quality's task was to assemble the cut parts into blank sport shirts for sale by Sara Lee. Each of the written agreements executed by the parties had terms of 12 or 18 months and did not require Sara Lee to purchase a minimum number of assembled shirts from Quality. Assembling shirts for Sara Lee was Quality's only line of business.

According to Sara Lee, throughout the parties' relationship, Quality had difficulties maintaining its performance due to production inefficiencies, internal quality problems, and high employee turnover. Quality contends that its problems were

---

1. Plaintiff's apparel manufacturing is handled by its unincorporated division, Hanes Printables. For simplicity, this opinion will refer only to Sara Lee.

precipitated by Sara Lee's inability to supply Quality with sufficient cut parts to fulfill its obligations. Despite these problems, the relationship lasted until mid-December 2000, when Quality shut down its Mexican plant after being informed that Sara Lee would not renew the relationship.

The problems underlying this case began in the spring of 1999, when it came time to negotiate a new contract. Sara Lee wanted to change the contract to address the issue of who had title to the cut parts and completed shirts, as well as to mandate higher quality standards. Sara Lee claims this new contract was negotiated, while Quality insists it was simply given the new contract to sign without input. Quality signed the contract in March 2000 ("2000 Agreement" or "Agreement").

Two significant events occurred before the 2000 Agreement was signed. First, in the summer or fall of 1999, the parties entered discussions about beginning a T-shirt product line at Quality. Sara Lee agreed to sell Quality the necessary equipment for approximately $39,000, and Quality agreed to attempt to begin producing T-shirts in the first half of 2000. No separate written agreement was executed with respect to T-shirt production. Second, in January 2000, Quality requested a loan of $200,000 from Sara Lee to avoid closing its plant. Sara Lee agreed to lend $100,000, but the incident caused Sara Lee to question the Quality relationship. Sara Lee began to explore placing more of its shirt production with other suppliers.

Shortly after the 2000 Agreement was executed, Quality again asked Sara Lee for money, this time in the form of a gift for $250,000. Quality threatened it would have to close without this help. Sara Lee refused, but suggested as an alternative an increase in the assembly price to supplement Quality's revenue. Quality came back with a deal whereby the assembly price increased from 9.5 cents per minute to 17.5 cents per minute, and then gradually decreased each month. Sara Lee sent Quality a fax on May 31, 2000, agreeing to the new price schedule. Quality responded by letter on June 1, 2000, stating that it intended to "build sport shirt production to 10,000—12,000" dozen over the next three to four months.

After the price increase agreement, the relationship quickly turned sour. Quality claims that it continued to receive insufficient quantities of cut parts to meet its goals, resulting in an abnormally high rate of "suspended dozens," or dozens that could not be completed because of some problem with the cut parts received. Sara Lee claims that an unexpected decline in the demand for sport shirts coupled with continued quality problems at Quality caused Sara Lee to decide not to renew the relationship with Quality at the expiration of the 2000 Agreement, which expired on December 31, 2000. They informed Quality of this decision first in person and then by letter, dated August 28, 2000. The letter cites an increase in Sara Lee's internal production capacity as the reason for not renewing the agreement. Quality sent Sara Lee a letter stating that the termination would likely cause Quality to fold, and indeed, Quality shut its plant in mid-December 2000. Quality did not pay its employees severance pay as required by Mexican law.

**B.   The 2000 Agreement**

Several provisions of the 2000 Agreement are relevant to the court's analysis. These provisions are summarized below:

1.   Applicable Law. The Agreement is governed by North Carolina law.

2.   Contract Term. The term of the Agreement was three years and six months, retroactive to July 1, 1997, and

lasting through December 31, 2000. The term was renewable by Sara Lee "upon written notice of renewal being given by [Sara Lee] not less than two (2) months prior to the end of the initial term or any anniversary thereof."

3. Production Schedule. Sara Lee was to provide Quality a production schedule ("Production Schedule" or "Schedule") each month. The Schedule was to contain the production requirements for the next three months. However, the Schedule was "subject to review and revision each month at [Sara Lee's] sole discretion . . . ."

4. Termination by Quality. Quality could only terminate the Agreement if Sara Lee failed to pay or became insolvent. The Agreement states that Quality would have no claim for damages for non-renewal of the Agreement unless it was terminated for one of these stated reasons.

5. Merger Clause. The Agreement also contains a standard merger clause stating that it is the entire agreement of the parties, that changes can be in writing only, and that the Agreement supercedes any previous agreements.

6. Payment of Employees and Compliance with Mexican and U.S. Law. The Agreement placed the responsibility for compliance with all applicable employment law on Quality and required Quality to indemnify Sara Lee for any liabilities arising from non-compliance.

### C. Procedural History

Sara Lee initiated this suit in December 2000, and Quality asserted several counterclaims. Both parties later amended their claims. Sara Lee's amended complaint asserts three claims. First, it asserts that Quality breached the contract by failing to pay its employees the statutorily required severance pay, by demanding a change in the price term of the Agreement, and by failing to meet the quantity and quality requirements set forth in the Agreement. Second, Sara Lee asserts a claim for unjust enrichment. Third, Sara Lee seeks a declaratory judgment that the Agreement expired December 31, 2000, and that Plaintiff has no further obligations or liabilities arising out of the non-renewal of the Agreement.

For its part, Quality asserts five claims. First, it asserts a breach of contract claim against Sara Lee for not renewing the 2000 Agreement and for not complying with the increased price agreement. Second, Quality claims that Sara Lee breached its duty of good faith and fair dealing by failing to provide sufficient cut parts and by not notifying Quality when it intended to end the parties' relationship. Third, Quality claims that Sara Lee owed Quality a fiduciary duty, and that Sara Lee breached that duty. Fourth, Quality asserts that Sara Lee committed constructive fraud by leading Quality to believe that the relationship would last into 2001. Finally, Quality claims that Sara Lee's actions amount to a violation of North Carolina's Unfair or Deceptive Trade Practice Act.

Sara Lee has moved for summary judgment as to all of Quality's claims, as well as to its own claim for declaratory judgment. Quality has moved for partial summary judgment as to Sara Lee's breach of contract and unjust enrichment claims.

### II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where an examination of the pleadings, affidavits and other proper discovery materials before the court indicate that there exists no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Where the evidence before the court could

lead a reasonable juror to find for the nonmovant, a genuine issue of material fact exists and summary judgment is improper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). All of the facts must be taken in the light most favorable to the non-moving party and the burden is on the moving party to establish that no material factual issues exist.

## III. BREACH OF CONTRACT CLAIMS

### A. Quality's Breach of Contract Claim

We begin by analyzing Quality's breach of contract claim. The evidence forecast shows that throughout the duration of the 2000 Agreement, Sara Lee provided Quality twelve-month Production Schedules rather than the three-month Production Schedules required by the Agreement. The Schedules showed shirt orders extending through June 30, 2001. The Agreement clearly terminated on December 31, 2000, unless Sara Lee elected in writing to extend the term. Quality claims the Schedules were essentially Sara Lee's written extension of the Agreement's term and that Sara Lee could not terminate the Agreement prior to that date, thus creating a triable ambiguity.

█ While Quality's argument has a certain attractive logic, the remainder of the Agreement does not support its position. First, it would be inconsistent with the Agreement for the Production Schedules, which were required by the Agreement, to be considered modifications or extensions of the Agreement. Further, under the Agreement, Sara Lee could change its requirements monthly regardless of amounts listed in previous Production Schedules. Whether the Production Schedules were for three months or twelve months, Sara Lee was free to alter them according to need. The Agreement explic-

itly states that it is not "a commitment by [Sara Lee] ... to have [Quality] assemble any minimum guaranteed volume of Products." To hold that by providing a twelve-month Production Schedule Sara Lee had somehow bound itself to that Schedule would plainly conflict with this term of the Agreement.

Quality answers that even after a revision, Sara Lee was still contractually obligated to the twelve-month term. However, if Sara Lee could revise or not revise the Production Schedule as it saw fit, it was then free to revise the Schedule to zero. In fact, the Agreement foresaw the possibility of drastic changes in quantity, permitting Sara Lee to change the Schedules by more than 20% with only 30–days notice to Quality. When it informed Quality in August 2000 that it would not be renewing the Agreement, Sara Lee effectively revised the Production Schedule to zero for the months after December 2000.

As for Quality's claim that Sara Lee breached the increased price agreement, there is simply no evidence that the agreement bound Sara Lee to a minimum number of shirts. Sara Lee's fax to Quality only details the price increase, but not a minimum purchase amount. Quality's letter to Sara Lee states that it was Quality's "goal" to increase output, but that does not bind Sara Lee to purchase increased output. Further, as it is undisputed that Sara Lee rejected Quality's request for an outright gift, it would make little sense for Sara Lee to then consent to a new price agreement that guaranteed the same result. Finally, the evidence shows that Quality never reached its target levels of production, even though sufficient cut parts were available to meet those targets.

The Agreement, which clearly states a fixed termination date, only permits renewal in writing, and clearly states that

monthly figures are subject to unilateral change, is simply not susceptible to the reading that Defendants suggest. The Agreement is clearly expressed and therefore must be enforced as written. *Parks v. Venters Oil Co.*, 255 N.C. 498, 121 S.E.2d 850, 853 (1961). As a matter of law, Sara Lee did not breach the Agreement; summary judgment as to Quality's breach of contract claim will be granted.

### B. Sara Lee's Breach of Contract Claim

#### 1. The Increased Price Agreement

Sara Lee claims that Quality breached the Agreement by threatening to cease production if Sara Lee did not agree to an increase in the assembly price paid by Sara Lee to Quality. In support of this argument, Sara Lee asserts that the Agreement permitted the parties to change the price of the parts shipped to Quality, but did not permit a change in the assembly price charged to Sara Lee. Further, Sara Lee asserts that the near doubling of the price, from 9.5 cents to 17.5 cents per minute, was unreasonable, citing to a section of North Carolina's Uniform Commercial Code (UCC), which Sara Lee concedes does not apply, N.C. GEN. STAT. § 25–2–305 (West 2001).

■ Sara Lee does not cite the section of the UCC which is directly on point, the section dealing with modifications. Under the UCC, the common law pre-existing duty rule is largely abrogated, requiring no additional consideration for contract modifications. N.C. GEN. STAT. § 25–2–209(1) (West 2001). Here, the parties agreed to a price increase, and that agreement is manifested in writing. Even if that writing does not satisfy the statute of frauds as Sara Lee alleges, the modification would still be enforceable as a waiver by Sara Lee. N.C. GEN. STAT. § 25–2–209(4) (West 2001). The increased price

agreement was a permissible modification under the UCC and does not constitute a breach of contract by Quality.

#### 2. Breach of Quality and Quantity Terms

Sara Lee further contends that Quality breached the Agreement by failing to meet the specified quality and quantity requirements. The Agreement calls for an average monthly defect percentage of no more than five percent. Evidence supplied by Sara Lee shows that Quality often failed to meet that requirement. However, Sara Lee did not cite poor quality as the reason for not renewing the Agreement, but rather cited an increase in internal production capacity as the reason for non-renewal. In addition, the two Sara Lee employees who were directly responsible for managing the relationship with Quality both stated in their depositions that the Agreement with Quality was not terminated due to poor quality. Even if Sara Lee had cited quality problems as the catalyst for the decision not to renew, the Agreement provides a specific remedy for breach of this condition; Sara Lee could have either cancelled the contract or charged Quality liquidated damages of $1500. Instead, Sara Lee merely informed Quality that it would not renew the Agreement due to increased internal capacity. Sara Lee cannot now consistently assert that Quality breached the Agreement.

#### 3. Breach of the Mexican Law Provisions

Sara Lee's final breach of contract claim is that Quality breached the provisions requiring it to maintain compliance with Mexican law. It is uncontested that Quality shut down its Mexican plant in December 2000 and did not give its employees severance pay. A lawsuit brought by the employees is pending in Mexico against

both Quality and Sara Lee ("Mexican Lawsuit"). Sara Lee claims that under the Agreement, Quality is obligated to indemnify Sara Lee against any liabilities and to pay for Sara Lee's attorney's fees arising from the Mexican Lawsuit. Sara Lee asserts that so far it has incurred $30,000 in legal fees in the Mexican Lawsuit.[2]

■ North Carolina law is peculiar in that contractual provisions for attorney's fees arising from litigation over the contract are not enforceable without statutory authorization. *Stillwell Enterprises, Inc. v. Interstate Equip. Co.,* 300 N.C. 286, 266 S.E.2d 812, 814–15 (1980) ("Even in the face of a carefully drafted contractual provision indemnifying a party for such attorneys' fees as may be necessitated by a successful action on the contract itself, our courts have consistently refused to sustain such an award absent statutory authority therefor." (citations omitted)). This rule applies whether the attorney's fees are alleged as costs or as an item of damages. *Id.* at 814. This leads to the counterintuitive result that parties cannot recover attorney's fees for which they explicitly contracted, while other contract damages that were not mentioned in the contract or envisioned by the parties *ex ante* may be recovered. However, according to this court's research, this is the status of the law in North Carolina.

In support of its claim, Sara Lee cites *Hinkle v. Bowers,* 88 N.C.App. 387, 363 S.E.2d 206 (1988). In that case, a purchaser of land was able to recover from the seller $150 he had paid to an attorney to secure clear title to the property. Sara Lee argues that the case at bar is most similar to *Hinkle,* as Sara Lee is not seeking to recover its attorney's fees for this case, but rather for attorney's fees in a separate case filed by a third party.

While Sara Lee's argument is compelling, *Hinkle* is too thin a reed, or too fine a thread, for the court to rely on. The North Carolina Court of Appeals later restricted *Hinkle,* stating that language in the opinion suggesting that attorney's fees were recoverable as contract damages was merely dicta. *Kornegay v. Broadrick,* 119 N.C.App. 326, 458 S.E.2d 274, 275 (1995). Sara Lee suggests that *Kornegay* is not on point because the claim there arose from a general warranty deed and not from an express contractual provision for attorney's fees. Sara Lee also argues that the *Kornegay* court noted that an express contractual provision would have changed the result.

■ Sara Lee is apparently referring to the statement in *Kornegay,* that "absent express statutory *or* contractual authority . . . attorney's fees are not recoverable." *Id.* (citations omitted) (emphasis added). The court does not agree that this disjunctive statement indicates that the *Kornegay* court would have reached a different result if an express contractual provision unaccompanied by express statutory authority had been present. Rather, the weight of the case law clearly supports Quality's position that statutory authority is absolutely required to recover attorney's fees. *See Stillwell,* 266 S.E.2d at 814–15; *Lee Cycle Ctr., Inc. v. Wilson Cycle Ctr., Inc.,* 143 N.C.App. 1, 545 S.E.2d 745, 752 (2001), *aff'd,* 354 N.C. 565, 556 S.E.2d 293 (2001); *Harborgate Prop. Owners Ass'n v. Moun-*

---

**2.** Quality has filed a Motion to Strike the Declaration of Christopher Fox, which alleges the attorney's fees paid by Sara Lee. Quality objects to the late appearance of the Declaration, which was filed with Sara Lee's brief opposing Quality's summary judgment mo-

tion, and accuses Sara Lee of "hiding the ball" and "dodging the ball." Sara Lee asserts that Quality did not "follow the ball." Since the ball is now in this court, we choose to punt. Defendants' motion to strike will be denied as moot.

*tain Lake Shores Dev. Corp.*, 145 N.C.App. 290, 551 S.E.2d 207, 212 (2001); *Delta Envtl. Consultants of North Carolina, Inc. v. Wysong & Miles Co.*, 132 N.C.App. 160, 510 S.E.2d 690, 695 (1999). Simply put, the court is bound by North Carolina precedent to hold that Sara Lee cannot recover its attorney's fees stemming from the Mexican Lawsuit.

Since Sara Lee has at present suffered no recoverable damages, the court finds that this claim is not ripe for judicial review. Even if attorney's fees were recoverable, the court has doubts as to whether the claim would have been ripe. Too many contingencies exist to make any firm ruling on damages at this time. Further, the result of this proceeding may affect the future actions of one or both parties. As a prudential matter, the court finds that this issue is simply not ripe for review at this time.

## IV. DECLARATORY JUDGMENT AND UNJUST ENRICHMENT

Sara Lee also moved for summary judgment on its declaratory judgment claim. Sara Lee seeks declaratory judgment that the 2000 Agreement expired on December 31, 2000, and that no further obligations under the Agreement are owed to Quality. The court finds no reason not to enforce the contract as written; Sara Lee's summary judgment motion will be granted.

Sara Lee also stated a claim for unjust enrichment as an alternative to contract damages. Since the contract is enforceable, Sara Lee's proper remedy is at law, not at equity. Therefore, Quality's summary judgment motion will be granted as to Sara Lee's unjust enrichment claim.

## V. BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

Quality also accuses Sara Lee of breaching its duty of good faith and fair dealing.

This claim is supported by three allegations. First, Quality asserts that Sara Lee failed to provide Quality with sufficient cut parts. Second, Quality asserts that Sara Lee induced Quality to invest in T-shirt manufacturing machinery and induced Quality to rely on the promise of continued work. Third, Quality asserts that Sara Lee concealed the fact that it was increasing its own manufacturing capabilities with the goal of terminating the relationship with Quality.

"Good faith and fair dealing are required of all parties to a contract; and each party to a contract has the duty to do everything that the contract presupposes that he will do to accomplish its purpose." *Weyerhaeuser Co. v. Godwin Bldg. Supply Co.*, 40 N.C.App. 743, 253 S.E.2d 625, 627–28 (1979) (citation omitted). A party to a contract "is required to act in good faith and to make reasonable efforts to perform his obligations under the agreement." *Id.* at 627. The UCC also states that "[e]very contract ... within this chapter imposes an obligation of good faith in its performance or enforcement." N.C. GEN. STAT. § 25–1–203 (West 2001). Good faith in the context of merchants is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." N.C. GEN. STAT. § 25–2–103(1)(b) (West 2001).

We address each of Quality's allegations in turn. First, the evidence does not support a finding that Sara Lee failed to provide sufficient cut parts to Quality. Evidence produced by Sara Lee, which Quality has not questioned, shows that Quality had sufficient cut parts in inventory to meet the Production Schedules, even accounting for the incomplete sets of parts reported by Quality. (Martinez Decl. Ex. 7.) The evidence also shows that despite having sufficient cut parts, Quality often

failed to meet the production levels listed on the Schedule.

Secondly, Sara Lee did not breach its duty of good faith regarding the T-shirt agreement. No new agreement governing T-shirt production was negotiated. While Quality claims there was no written agreement concerning T-shirts, the 2000 Agreement clearly contemplates the possibility of both T-shirt and sport shirt production. (Defs.' Br. Opp'n Summ. J. Ex. 3 at 7.) Scheduled amounts of T-shirts were listed on the same Production Schedules that listed the sport shirt production and that were required by the Agreement. As previously discussed, nothing in the Agreement binds Sara Lee to a minimum quantity.

Finally, Quality contends that Sara Lee concealed the fact that it was building its own shirt manufacturing capability with the goal of terminating the relationship with Quality. In support of this allegation, Quality cites to numbers indicating that Sara Lee's internal capacity increased greatly from 1998 through 2000, while Quality's production measured as a percentage of Sara Lee's entire capacity decreased significantly. However, the Agreement unambiguously states that Quality was not Sara Lee's sole supplier. In addition, as previously discussed, the Agreement gives Sara Lee the power to dictate quantities and to terminate the relationship as of December 31, 2000. Sara Lee was under no obligation to disclose to Quality its future plans for production. Simply put, Sara Lee did what was expressly permitted in the Agreement and did not breach any duty of good faith and fair dealing.

## VI. BREACH OF FIDUCIARY RELATIONSHIP AND CONSTRUCTIVE FRAUD

Quality further claims that a fiduciary relationship existed between it and Sara Lee, and that Sara Lee breached the fiduciary duty owed Quality and committed constructive fraud. Quality argues that a fiduciary relationship existed because Sara Lee, in effect, held all the cards. *See Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 348 (4th Cir. 1998) ("Only when one party figuratively holds all the cards—all the financial power or technical information, for example—have North Carolina courts found that the 'special circumstance' of a fiduciary relationship has arisen." (citation omitted)). Quality argues that Sara Lee's superior position in the relationship, specifically its ability to dictate terms and Quality's dependance on the relationship, created a fiduciary responsibility by Sara Lee to Quality.

We find that no fiduciary relationship existed between Quality and Sara Lee. Most informative to this finding is the Fourth Circuit's opinion in *Broussard*. There, the court found that under North Carolina law "parties to a contract do not ... become each others' fiduciaries; they generally owe no special duty to one another beyond the terms of the contract and the duties set forth in the U.C.C." *Broussard*, 155 F.3d at 347 (citing *Branch Banking and Trust Co. v. Thompson*, 107 N.C.App. 53, 418 S.E.2d 694, 699 (N.C.App.1992)). The court further held that this general rule is particularly applicable in situations where the contract at issue contains a merger clause making the contract the entire agreement and precluding any other duties not listed in the contract. *Id.* Similarly here, the Agreement contains a merger clause purporting to be the entire agreement between the parties.

Further, the fact that Quality and Sara Lee are mutually interdependent is not sufficient to impart a fiduciary duty. In cases where parties are situated similarly

to Quality and Sara Lee, North Carolina courts have not found that a fiduciary relationship exists. *Tin Originals, Inc. v. Colonial Tin Works, Inc.*, 98 N.C.App. 663, 391 S.E.2d 831, 833 (1990); *Broussard,* 155 F.3d at 348. As is proper, this court is reluctant to extend North Carolina law to cover this instance. *See Broussard,* 155 F.3d at 348 ("[A]s a federal court exercising concurrent jurisdiction over this important question of state law we are most unwilling to extend North Carolina tort law farther than any North Carolina court has been willing to go."). As expressed in the Agreement, the relationship of Sara Lee and Quality is that of purchaser and independent contractor. The court will not now strip Sara Lee of the benefit of its bargain because its business interests diverged from Quality's. *See id.* at 348–49.

■ Quality also asserts a claim for constructive fraud. Constructive fraud arises when one party to a confidential or fiduciary relationship abuses its position to the detriment of the other party. *See Watts v. Cumberland County Hosp. Sys.,* 317 N.C. 110, 343 S.E.2d 879, 884 (1986). Since Quality has failed to show a confidential or fiduciary relationship existed, its claim for constructive fraud must also fail.

## VII.  UNFAIR AND DECEPTIVE TRADE PRACTICES

■ Quality's final claim is for violation of North Carolina's unfair and deceptive trade practice statute, N.C. GEN. STAT. § 75–1.1 ("Chapter 75").[3] Whether certain acts or practices are unfair or deceptive is a matter of law for the court to decide. *See Hardy v. Toler,* 288 N.C. 303, 218

S.E.2d 342, 346–47 (1975). Even an intentional breach of contract is insufficient to establish unfair or deceptive trade practices unless the breach involves "substantial aggravating circumstances." *Branch Banking and Trust v. Thompson,* 107 N.C.App. 53, 418 S.E.2d 694, 700 (1992); *Computer Decisions, Inc. v. Rouse Office Mgmt. of North Carolina, Inc.,* 124 N.C.App. 383, 477 S.E.2d 262, 266 (N.C.App.1996). Having found as a matter of law that Sara Lee did not breach the Agreement, did not breach its duty of good faith and fair dealing, was not a fiduciary of Quality, and did not commit constructive fraud, the court further finds that there is no other evidence of substantial aggravating circumstances that would amount to a violation of Chapter 75.

## VIII.  CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Summary Judgment will be granted; Defendants' Motion for Partial Summary Judgment will be granted; Defendants' Motion to Strike will be denied as moot.

A judgment in accordance with the memorandum opinion will be entered contemporaneously herewith.

---

**3.** The court notes that Sara Lee argues that North Carolina's Chapter 75 should not apply in this case because Quality did not suffer an in-state injury, citing *The 'In' Porters, S.A. v. Hanes, Printables, Inc.,* 663 F.Supp. 494 (M.D.N.C.1987). In light of our rulings on the other issues in this case, the court need not rule on this argument. However, we do note that Sara Lee drafted the Agreement and chose North Carolina as the governing law; Sara Lee should be prepared to take the bitter with the sweet.